Norman F. EPPES and James Neal Eric Butcher, On Behalf of Themselves and Other Underwriters, Plaintiffs,

v.

H.E. SNOWDEN and L.P. Doherty, Defendants.

Civ. A. No. 84–218.

United States District Court, E.D. Kentucky.

Sept. 4, 1986.

Lionel A. Hawse, Stephen M. O'Brien, Landrum, Shouse & Patterson, Lexington, Ky., Harvey A. Feintuch, Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey, New York City, for plaintiffs.

F. Lee Bailey, Bailey, Gerstein, Rashkind & Dresnick, Miami, Fla., Harry B. Miller, Miller, Griffin & Marks, Charles Calk, Gess, Mattingly, Saunier & Atchison, James A. Shuffett, Shuffett and Shuffett, Lexington, Ky., for defendant Snowden.

Thomas H. Burnett, Lexington, Ky., for defendant Doherty.

## MEMORANDUM OPINION

WILHOIT, District Judge.

This declaratory judgment action was commenced by a group of insurance underwriters, associated with Lloyds of London, against their insureds, H.E. Snowden and L.P. Doherty. The defendants owned an undivided one-half interest in a thoroughbred stallion named PELERIN. The horse was covered by policies of mortality insurance. PELERIN met an untimely death on March 25, 1984. The plaintiffs contend (1) that the actual cash value of the horse, at the time of death, was less than the $1,450,000.00, coverage, and (2) that the horse died of "poison" that was not a peril insured against.

The defendants have counterclaimed for the limit of coverage as compensatory damages and demanded an additional $10,000,-000.00, in punitive damages, alleging bad faith.

The trial of this controversy ended in a mistrial on its fifth day and the Court is presently concerned with plaintiffs' motion to strike defendants' answer and counterclaim; to declare that no coverage exists for PELERIN'S death; and for sanctions under FRCP 11 for all court costs and expenses, including reasonable attorneys

fees. These fees, costs and expenses amount to $194,131.52.

The mistrial occurred when the Court learned of that three witnesses would prove, in rather convincing fashion, that during discovery the defendant, Snowden, had manufactured and produced ten letters from prominent horsemen all dated *prior* to PELERIN'S death, when in fact, at least two of the letters had been backdated by him (or at his direction) and were actually written *after* the horse died. The dates on the letters, if authentic, lent great weight to the issue of PELERIN'S actual cash value on March 25, 1984.

In response, the defendant produced one of the authors at a hearing held ten days later who testified, under oath, that *his* letter was genuine and was written *before* the horse died. Within a few weeks, but before the Court had ruled on the pending motion, the last mentioned witness *recanted* his previous testimony and admitted that his letter had actually been written a year later than its indicated date and *after* PELERIN'S death.

The question therefore is whether Snowden's conduct amounted to a fraud upon the Court that would warrant striking the answer and counterclaim, granting the declaratory relief and sanctions. Corollary to that is the question of whether the "silent partner," Doherty, would be included in any of the requested sanctions.

This opinion takes the view that the answer and counterclaim should be stricken but the award of costs, expenses and fees should be borne by Snowden alone.

## I. FINDINGS OF FACT

A. Background—prelude to trial.

The defendants have been friends and partners in the horse business since 1952 and operated the Stallion Station at Lexington, Kentucky. This operation has had above average success. They have syndicated over 100 stallions[1]. DUST COMMANDER and BOLD FORBES, winners of the Kentucky Derby in 1970 and 1976, were bred there. HASTY ROAD ran second only to DETERMINE in the 1954 Derby and was likewise sired at the Stallion Stable. The defendants once owned, and sold (for $25,000.00) the legendary gelding, JOHN HENRY. All the foregoing are clear indications that the defendants were and are knowledgeable, experienced and established horsemen.

The defendant, Snowden, was also a partner in North & Associates, an insurance agency in Lexington. The agency had placed risks with plaintiffs' syndicate over a number of prior years and the amount of business was described as significant. Snowden received a commission of 50% of all premium commissions that he generated—and this included the policies on PELERIN. The relevancy of this information will become apparent later in this opinion.

In considering Doherty's position the Court has considered the defendants' relationship which has been established by a number of uncontradicted facts.

(1) Doherty and Snowden have been in a continuing business relationship since 1952. They were partners in operating the Stallion Station.

(2) Doherty and Snowden were partners in the ownership of PELERIN. And they maintained a joint bank account which was the source of funds to purchase the horse.

(3) Snowden testified in a discovery deposition that due to his partner's ill health, he had Doherty's general power of attorney, which was given to him on November 14, 1980, and is of record in the Fayette County, Kentucky, Clerk's Office. The power authorized Snowden to act, "With full power and in my name." Snowden had a general power to conduct all forms of business, including but not limited to signing contracts and drawing checks and *"to institute or defend suits concerning my property or rights."*

(4) On behalf of Snowden and Doherty's partnership, Snowden negotiated and

---

**1.** A stallion syndicate usually involves 40 shares and each share entitles the owner to one breeding season with the stallion each year he stands. These shares, or annual seasons, are routinely bought and sold on an open market.

signed the contract for the purchase of PELERIN.

(5) Snowden negotiated and applied for the insurance policies around which this litigation centers; Doherty and Snowden, as individuals rather than the partnership, are named as the insureds in these policies.

(6) Likewise, Snowden has been the only partner to take an active role (on the surface) in dealing with the insurer subsequent to the death of PELERIN, and it was he who filed a claim with plaintiffs' syndicate requesting the maximum limits of the insurance policies in question.

(7) Doherty has failed to actively participate in any portion of this litigation. In fact, he has twice sought and obtained protective orders from this Court to prohibit the plaintiffs from taking his deposition for discovery purposes. All of the plaintiffs' discovery requests that would have required the signatures of both defendants have been signed only by Snowden.

(8) On the opening day of this ill-fated trial counsel advised that because of illness Doherty would not be present but that his interest would be represented by Snowden.

(9) And most important of all, there is nothing in this record to rebut an inference that he did indeed acquiesce with *full* knowledge. He did not appear at any one of the three post-trial hearings to disavow Snowden's actions.

In the fall of 1981, the defendants purchased the subject stallion in England from Sir Philip Oppenheimer and agreed to pay a purchase price of $2,000,000.00. PELERIN'S sire was SIR GAYLORD, a sire of stakes winners. And he was out of a respectable mare. The object was to acquire a horse with breeding for distance and the thought was to syndicate the stallion in this country where most of the top bloodlines favor the sprinters.

PELERIN was immediately insured for $2,500,000.00 with the plaintiffs' syndicate and this coverage was written through Snowden's insurance agency. One year later the coverage was reduced to $1,750,-000.00.

Although PELERIN had a moderate degree of success racing in Europe, he was not a consistent winner in the United States. He won graded stakes races in California and Florida in 1983. He was shipped to Louisiana in early 1984 where he ran h is last race and was out of the money.

In July, 1983, the defendant Doherty sold his one-half interest to Mr. Howard Caskell for $800,000.00. Subsequently, Doherty purchased a one-fourth interest back from Snowden for $400,000.00. This sale would indicate that the defendants were only valuing the horse at $1,600,000.00. This was explained away by saying that Caskell was a widely respected horseman and it was to their advantage to involve him with the stallion looking to the time when PELERIN would be syndicated.

In August, 1983, the defendants, through several policies of insurance, insured their *one-half* interest in PELERIN with the plaintiff syndicate for $1,450,000.00.

PELERIN became ill following his last race in Louisiana. He was given the best attention and treatment but his condition deteriorated. On March 6, 1984, he was taken to Louisiana State University where he was treated by Doctors Reed and Jill McClure. PELERIN did not recover and died on March 25, 1984.

A post mortem examination revealed that the cause of death was "vitamin D toxicosis." The first dispute that arose between the parties was solely directed to the actual cash value of the horse on March 25, 1984. The *cause* of his death was not raised until much later.

The plaintiffs made a settlement offer of $1,000,000.00, on July 6, 1984. The defendant Snowden countered by agreeing to forgive $100,000.00, and made a counter demand of $1,350,000.00.

The plaintiffs contended at trial that Snowden threatened to file a law suit if this demand was not met and also seek punitive damages. The plaintiffs contended that although they did not believe that PELERIN was worth $1,000,000.00, they made the offer as a compromise and for the additional and very practical reason

that the plaintiffs had received considerable business through Snowden and his insurance agency. They wished to further enjoy his favor.

Negotiations were unsuccessful and this declaratory judgment action was filed by the plaintiffs on July 11, 1984. The original complaint raised only the issue of PELERIN'S value at the time of death. It was not until December 3, 1984, by their amended complaint, that other policy conditions and exclusions were raised for declaratory adjudication.

In this regard, the policies included an exclusion that eventually became a central issue in the case. It provided:

> "This insurance does not cover death directly or indirectly caused by, happening through or consequence of ... (a) *poison*, ..." (Emphasis added).

This policy exclusion would deny coverage upon a showing that PELERIN died of "poison," regardless of how, where and when. The term "toxicosis" was interpreted to mean "poison." There was no question concerning the accuracy of the pathologist's conclusions. It was the plaintiffs' position, through numerous expert witnesses, that PELERIN had ingested excessive amounts of vitamin D and when it attained excessive accumulations in his body, it became toxic—or a "poison."

The defendants countered with a number of experts. They took the view that the levels of vitamin D became too toxic in PELERIN because of a metabolic deficiency, i.e., he was unable to either absorb or pass it naturally. These experts conceded that this theory does not appear in the literature, before PELERIN.

The plaintiffs argued strenuously for summary judgment prior to trial and for a directed verdict at the trial. Precedents squarely on point either do not exist or have successfully escaped our notice.

On the issue of value, plaintiffs had a number of experts who placed a value of $300,000.00–$400,000.00 on PELERIN at the time of his death. During discovery the defendant Snowden maintained through answers to interrogatories, a discovery deposition and documents produced at plaintiffs' request, that PELERIN was to be syndicated with 40 shares at a price of $75,000.00 per share. He claimed that several very prominent horsemen had indicated their desire to purchase these shares at that price *before* the horse died. According to defendants the horse was therefore worth $3,000,000.00.

Apparently, the plaintiffs were showing some skepticism. And in response Snowden produced ten letters from nine horsemen that were all *dated prior* to PELERIN'S death. These letters were from highly regarded people in the horse industry. Most had national reputations.

The plaintiffs took a discovery deposition of James E. Bassett, III, President of the Keeneland Association, who appeared on the defendants' witness list and was to testify as to PELERIN'S value. Mr. Bassett valued PELERIN at $3,000,000.00, relying in part upon the ten letters produced by Snowden. Bassett reasoned that if such knowledgeable horse people were willing to pay $75,000.00 for a share in the horse, *then* PELERIN would reasonably be worth that amount of money.

B. The trial. January 22, 1986—April 25, 1986.

■ The case was set for trial before a jury on January 22, 1986, in Lexington, Kentucky. Two weeks before the trial plaintiffs filed an offer of judgment in the amount of $1,000,000.00, FRCP 68. This offer was later rejected at a pre-trial conference. Snowden was convinced that plaintiffs conduct was so egregious that he would be awarded punitive damages based upon the authority of *Feathers v. State Farm Fire and Casualty Co.*, 667 S.W.2d 693 (Ky.App.1983). This Court had relied upon this Kentucky decision in overruling plaintiffs' pre-trial motion for summary judgment on the issue of punitive damages. Herein lies one of the great ironies of the case. On June 12, 1986 the Supreme Court of Kentucky in *Federal Kemper Insurance v. Hornback*, Ky., 711 S.W.2d 844 (Ky.1986), expressly overruled *Feathers*. The rule now prevailing in the Common-

wealth of Kentucky is that an insurance company is not exposed to punitive damages for a frivolous defense to a claim for insurance coverage since the rules already authorized sanctions that could be imposed in such instances. The decision was handed down by a sharply divided Court. Its vote was 4–3.

### January 22–28, 1986

The trial of this action commenced on January 22, 1986, with a six-person jury. The battle was fierce, expensive, and well-practiced. The plaintiffs produced expert veterinarians from L.S.U., Purdue University and the University of Illinois. Three bloodstock agents testified that PELERIN was worth only $300,000.00–$400,000.00 at the time of his death. One agent and a Lloyd's underwriter were flown here from England.

The defendants countered with their experts in the field of veterinary science, pathology and toxicology. They came from L.S.U. and Cornell University and Ithaca, New York. On the question of value defendants produced Mr. Lawrence E. Ensor, Jr., the Chief Executive Officer of Fasig-Tipton of New York. The defendant Snowden also testified and his last appearance was on January 28, 1986, the fifth day of trial.

### January 28, 1986

Following the noon recess on January 28, 1986, the fifth day of trial, defendants' counsel advised the Court that due to information which had first come to their attention during the morning session, ethical considerations compelled them to move for leave to withdraw. Counsel further advised that they were not at liberty to divulge this information to the Court due to the attorney-client privilege.

Following counsel's reticence plaintiffs' counsel cheerfully offered an explanation. Three disinterested ladies were waiting in the wings to testify that at least 2 of the 10 letters previously mentioned and produced by Snowden had been backdated to make them appear to have been written *before* PELERIN died, when in fact, the letters were written one year later.

It must be here emphasized that this revelation came on the heels of Snowden's testimony that very morning concerning these letters. As we look back in time and read the transcript, we can now recognize an enormous inward struggle as Snowden attempted to gloss over the truth. His cross-examiner knew the truth. But Snowden apparently did not realize that his cross-examiner knew the truth.

The salient fact is, at that point in time, the *Court* did not know the truth. The answers seemed satisfactory. The following colloquy, however, occurred between Mr. O'Brien and the defendant:

Q. I believe my question was, did you have written commitments from all these people?

A. Well, I don't say we had written commitments from all of them. We had written commitments which came in at various times. But I had verbal commitments; for example, I would see maybe Mr. Combs at a sale or in Florida, I would tell him about the horse and he would say, "Yeah; we're going to take a share...."

*    *    *    *    *    *

Q. Now you say you did have written commitments to purchase a share in this horse from a number of people and you have named the people.

A. Verbal and written.

Q. Did you have them in hand before this horse died?

A. We certainly had some of them. Most of them, I would say. I can't tell you an exact number.

Q. You have supplied some of them, copies of some letters; is that what you are referring to as written commitments?

A. Yes. Those letters are written commitments confirming their intent or their agreeing to buy a share.

Q. And the letters you provided us are letters that you had, letters of commitment that you received before this horse died?

A. I don't know about all the letters; many of them were.

*    *    *    *    *    *

Q. You think you had these in hand, basically, before the horse died.

A. Yes; at least most of them.

Q. You mentioned a letter from, I think you said Johnnie Jones and you said Warner Jones.

A. That's correct.

Q. You have one from Spendthrift Farm, Leslie Combs?

A. Yes. Mr. Combs, I think, finally wrote me a letter.

Q. Did you have one from—let's see—did you have one from Dwayne Rogers, Rog-Acres Farm?

A. I think Dwayne finally sent us a letter, before he left, or whatever happened.

Q. And those are among the written documents that you have supplied to us as evidence of these people's commitments and willingness to buy a share in the horse for $75,000; is that right.

A. That's correct.

Q. And did you have those letters that I have mentioned—Warner Jones, Johnnie Jones—that you already mentioned—Leslie Combs and the one from Dwayne Rogers, Rog-Acres Farm—in hand before this horse died?

A. I had many of them. I can't recall if I definitely had those right at that time; but I would assume that I did.

Q. If Rog-Acres' letter was dated January 5, 1984, would you assume that you had received it by the time this horse died?

A. Well, I don't know; I wasn't here in January that year.

Q. If Mr. Combs' letter was dated February 3rd of 1984, would you assume it arrived sometime shortly thereafter?

A. I would think it would. However, that could be one of his notes when he made notes and put in his pocket, when he agreed to buy it. It would be one or the other.

This testimony was not true. There is now no question but that all ten letters had been backdated to make it appear to the Court that these prominent and knowledgeable horsemen had expressed themselves *before* the horse died. True, they may have made oral offers before the horse died but it is now a fact that the opinions expressed in the *letters* came *after* PELERIN died. The credibility of these "offers" to buy a share for $75,000.00, after the fact became highly questionable. Talk is cheap, they say.

The Court had placed great weight on these opinions. The witnesses that had preceded Snowden to the stand had relied on the letters. The next witness to appear was James E. Bassett, III, President of the Keeneland Association and a highly respected horseman. He had relied upon those ten letters in his previous discovery deposition. We were all misled. Counsel were permitted to withdraw. A mistrial was declared.

The plaintiffs promptly moved the Court (1) to strike the defendants' Answer and Counterclaim, as amended (2) to enter a declaratory judgment in favor of the plaintiffs, which would absolve them from any liability under the policies of insurance for the death of PELERIN and would deny the defendants' any recovery on said insurance policies, and (3) to direct the defendant Snowden to pay the plaintiffs' costs and expenses, including but not limited to attorneys' fees and witness fees. The defendants had been represented by another law firm throughout although they had not actively participated. The trial was adjourned to the following day.

■ January 29, 1986

The Court heard the plaintiffs' foregoing motions on the following day. The plaintiffs called their three "ladies in waiting." And their testimony went to the authenticity of the two letters just mentioned.

The first witness was Ms. Sandra Hoskins and her testimony concerned a letter addressed to the defendant Snowden that she typed under the letterhead of Rog Acres Farm while she was employed there as a secretary. This letter was dated January 5, 1984, and was purportedly signed by Dwayne L. Rogers on that same date. In the letter, Mr. Rogers expressed his interest in purchasing two shares in PELERIN for $75,000 per share. Ms. Hoskins fur-

ther stated that she first worked for Rog Acres Farm in May of 1985, which was 14 months *after* PELERIN died. She did not recall the exact date that she typed this letter but she specifically recalled that Dwayne L. Rogers instructed her to *back-date* the letter to January 5, 1984.

Secondly, Ms. Nancy Holtzclaw testified that she was the office manager at Rog Acres Farm from January of 1984, through May of 1985, and confirmed the fact that Sandra Hoskins was *not* employed there in January of 1984. She had no knowledge of the horse PELERIN, or of the farm's plan to acquire shares in PELERIN, even though her position as office manager would give her reason to know of such plans.

Plaintiffs' third witness was Ms. Debbie Karutz. She began working at Spendthrift Farm as a receptionist and switchboard operator in July of 1984, and she was still employed there at the time of the hearing. Her testimony concerned a letter dated February 3, 1984, to defendant Snowden from Leslie Combs, II, under the letterhead of Spendthrift Farm, wherein Mr. Combs expressed an interest in purchasing a share in PELERIN, which he understood was going to by syndicated for $75,000 per share.

Ms. Karutz stated that Mr. Combs came to her in later afternoon after all of the regular secretaries had left for the day and instructed her to backdate the letter to February 3, 1984. This would have been about five months prior to the time she became employed at Spendthrift.

At the conclusion of the foregoing the defendant Snowden did not offer to deny or explain this line of testimony, but rather his attorney asked for time to prepare a rebuttal to these charges.

There were eight letters to hear from. The Court, from the bench, *specifically warned* against an attempt to authenticate the dates appearing on these letters if they were not in fact genuine. An Order was issued impounding the originals and the defendant was admonished that the letters would be submitted for scientific analysis if any of the authors showed up to authenti-

cate their letter. The trial was then adjourned to February 6, 1986.

■ February 6, 1986

The hearing resumed on February 6, 1986, as scheduled. Although there were eight letters remaining in question, only one author came forward. Mr. Norman L. Casse, owner of Cardinal Hill Farm in Ocala, Florida, had written a letter to Snowden, dated December 27, 1983, three months *prior* to PELERIN'S death. Pertinent portions of his sworn testimony are set out as follows:

MR. CALK AND MR. CASSE

Q. Mr. Casse, would you examine that letter, please?

A. Yes, sir.

Q. Mr. Casse, what is the date of that letter?

A. December 27, 1983.

Q. Mr. Casse, is that date on that letter the true and correct, accurate date of that letter?

A. Yes, sir, it is.

Q. Was the letter mailed, so far as you can recall, on or about that date?

A. I believe so, sir.

\* \* \* \* \* \*

MR. HAWSE AND MR. CASSE

Q. Mr. Casse, in looking at your letter dated December 27, 1983, did I understand that that was posted in the United States Mail on or about that date?

A. I believe so, sir.

Q. Is there some question in your mind about that?

A. Not really.

Q. Who typed that letter for you?

A. I did, sir.

Defendant Snowden offered no other proof as to the authenticity of the remainder of the letters in question. The Court commented at that time that one could reasonably infer that Snowden's failure to offer proof as to the authenticity of the remaining letters meant that these letters had also been backdated. Snowden's counsel asked the Court not to force him to respond to these remarks. Snowden did not testify.

The Court believed Casse and was misled to believe that his letter was written *before* the horse died. This is best reflected by comments at the conclusion of the hearing:

THE COURT: "... Now inasmuch as that only one author of a letter came in and testified that the letter was written prior to the death of the horse, as opposed to everyone coming in, *I will not direct that the letter be submitted to the Justice Department.* But I think I am free to infer that because the others did not come in, that, most likely, these letters were composed *after* the horse's death. And that is very disappointing. That is very disappointing." (Emphasis added).

At the conclusion of the hearing on February 6, 1986, the Court took the plaintiffs' foregoing motion under advisement and gave the parties additional time to file responsive memoranda.

■ April 25, 1986

The Court, *sua sponte,* convened a hearing on pending motions in Lexington, Kentucky, on April 25, 1986. A prominent law firm representing the witness Norman Casse, had petitioned to be heard *before* a final decision was made in the case. All parties and counsel were present except the defendant, Doherty.[2]

It seemed that Casse had begun to worry about the testimony given on February 6, 1986. It was his wish to *"recant"*:

MR. IRWIN AND MR. CASSE

Q.29  Mr. Casse, the Court is entitled to an explanation. Why did you say those things on the witness stand before and why are you saying these things now?

A.  Mr. Snowden had called and asked me to come up here and I really didn't even want to appear, and I showed up in town. *In his lawyer's lobby he begged me to come up and testify,* and he said, after all, you know it is just a confirmation of something you agree upon verbally. And, I just didn't use sound judgment, I guess, in what I did. (Emphasis added).

Q.30  At this time, could you state under oath with any degree of candor that you, in fact, wrote the letter? Could you state that for a fact?

A.  I can't state it, that I wrote it definitely. It is my signature. I think there might be a strong possibility that I gave a piece of stationery with my name signed on it, because I have for the last three weeks tried to pinpoint in my mind when I might have written this letter, and I cannot come up with a solid date.

\*       \*       \*       \*       \*       \*

MR. CALK AND MR. CASSE

A.  I said I went home and I tried to determine for sure whether or not I had written this letter at this time, and things led me to believe that I did not write this letter at this time.

Q.19  What led you to believe that?

A.  Fact one is where I was at at this time, on this date. I checked back into my records and I was in a little town called Sunderland, Massachusetts, and there's no way I could have had my stationery or my typewriter there with me, and then I got to trying to dig back and tried to remember the situation to the best of my knowledge. And, I remember Harold calling me several times saying he needed a letter stating that I had agreed to purchase a share in Pelerin. And, I don't know whether I wrote the letter and backdated it or whether I gave him a piece of stationery with my signature on it to let him do the letter. This was about ten months to a year after December of 1983.

\*       \*       \*       \*       \*       \*

Q.24  But, you're not prepared today to say that you're even the author of the letter, that somebody else may have written it, right?

A.  Sir, I don't know for sure who wrote the letter, sir.

---

**2.**  Mr. Doherty has never appeared at these proceedings. He has been represented by independent counsel since the hearing held on February 6, 1986, and all others since that time.

Q.25 But, you're certain that you did not write this letter at the—at or about the date that appears on it. Is that correct? You're certain of that, now?

\* \* \* \* \* \*

MR. HAUSE AND MR. CASSE

Q.7 My question was, the letter which is before, Exhibit No. 62—

A. Right.

Q.8 —was it not, in fact, generated in May or early June of 1985?

A. I believe it was generated at least a year after the date that's on it. I don't know whether it was May or June, sir.

\* \* \* \* \* \*

Q.32 What did he tell you he was going to do with the confirmation of the agreement?

A. He didn't tell me at the time that it was going to be entered into a court case.

\* \* \* \* \* \*

Q.38 Well, specifically, then, was this letter that bears your signature written before or after the horse, Pelerin, died?

A. I believe after the horse died, sir.

Q.39 You believe?

JUDGE WILHOIT: Now, wait a minute. Wait a minute. That's an equivocal answer.

A. Okay.

JUDGE WILHOIT: Now, you answer the question. It was a direct question, and you answer it directly. Was the horse dead or was it alive—

A. After the horse—

JUDGE WILHOIT: —when you either—when you, at least, signed your name to that piece of paper?

A. Yes, sir. Okay.

JUDGE WILHOIT: Which was it?

A. The horse was dead.

JUDGE WILHOIT: And, you knew it was dead?

A. Yes, sir.

\* \* \* \* \* \*

JUDGE WILHOIT: And, when you testified in that very witness stand on February 6th, you knew that when you signed that piece of paper that the horse was dead?

A. Yes, sir.

JUDGE WILHOIT: But, your testimony was that you signed that piece of paper before the horse died?

A. Yes, sir.

JUDGE WILHOIT: You realize that, don't you?

A. Yes, sir, I do.

JUDGE WILHOIT: And, you realize that the testimony that you gave on February 6th that tried to lead me to believe that that horse was still living when you put your signature on that piece of paper, that that was not true at that time? You knew that, didn't you, Mr. Casse?

A. On this, yes, sir.

Following this testimony, Snowden was given an opportunity to testify and either contradict or explain Casse's testimony (1) that Snowden was the moving force to fabricate the backdated letter, and (2) that he had "begged" Casse to testify to facts that they both knew were false, at the time. Snowden kept his peace. Doherty had not applied to testify.

At the conclusion of this hearing the Court announced its ruling on pending motions. This opinion is the finalization of actions that the Court indicated it would take. Following the hearing, Doherty petitioned to testify to save his portion of the counterclaim and for reasons hereinafter set out this petition was denied.

## II. CONCLUSIONS OF LAW

### A. Was Fraud Practiced Upon the Court?

The first consideration must focus on the question of whether a fraud has been practiced on the court. The seminal case is *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944). In that case, attorneys for a patent seeker wrote an article that was published in a trade journal (to bolster a patent application which had not been favorably received by the Patent Office). The article was ostensibly authored by a

"disinterested expert" and praised the ingenuity of the process sought to be patented. Ultimately, the patent issued and the successful patent applicant filed and won a suit for patent infringement in the Third Circuit Court of Appeals in 1932. This result reversed the District Court's holding in 1929 that no patent infringement had been proved.

A number of years passed and it came to light that Hartford's attorneys were the actual authors of the trade journal article presented to the Patent Office. In 1941, Hazel-Atlas brought suit to have the previous 1932 judgment set aside. The case ultimately found its way to the United States Supreme Court. The prior judgment was vacated and we quote from that opinion:

> Every element of the fraud here disclosed demands the exercise of the historic power of equity to set aside fraudulently begotten judgments. This is now simply a case of a judgment obtained with the aid of a witness who, on the basis of after-discovered evidence, is believed possibly to have been guilty of perjury. Here, even if we consider nothing but Hartford's sworn admissions, we find a deliberately planned and carefully executed scheme to defraud not only the Patent Office but the Circuit Court of Appeals.
>
> \*      \*      \*      \*      \*      \*
>
> Furthermore, tampering with the administration of justice in the manner indisputably shown here involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society.

*Id.* at 245–246, 64 S.Ct. at 1001.

> In conclusion, the Supreme Court stated: Had the District Court learned of the fraud on the Patent Office at the original infringement trial, *it would have been warranted in dismissing Hartford's case* ... (Emphasis added)
>
> The total effect of all this fraud, practiced both on the Patent Office and the

courts, calls for nothing less than a complete denial of relief to Hardford for the claimed infringement of the patent thereby procured and enforced.

*Id.* at 250, 64 S.Ct. at 1003.

This 1944 decision was more recently followed in *United Business Communications, Inc. v. Racal-Milgo, Inc.,* 591 F.Supp. 1172 (D.Kan.1984). The facts are strikingly similar. A previously adjudged patent infringer filed for relief from judgment of infringement. The District Court held that the patent holder's presentation of false testimony, fabrication and nondisclosure of relevant information in the original patent infringement action constituted fraud on the court, thereby entitling the adjudged infringer relief from the judgment.

Plaintiff contended that the defendant's conduct constituted fraud on the court in light of the standards applied by the Supreme Court in *Hazel-Atlas.* Although the District Court held in favor of the plaintiff, the Court opined that what amounts to fraud on the court is a nebulous concept that must turn upon the facts of each case.

The Court stated, "The controlling factors appear to be whether the misconduct tampers with the judicial machinery and subverts the integrity of the court itself." *Id.* at 1186.

The case of *Carlucci v. Piper Aircraft Corp.,* 102 F.R.D. 472 (S.D.Fla.1984), involved a consolidated action by three individuals against the defendant arising from the deaths of three people resulting from an airplane crash.

The defendant continuously disobeyed orders and obstructed discovery by delaying proceedings and making misrepresentations to the court pertaining to discovery production.

The District Court set out the chronology of the action from 1978, when the complaint was filed, until 1984, when the Court struck defendant's pleadings and entered a finding of liability against the defendant. The Court found that the defendant had delayed and obstructed discovery to the

extent that the case was five years old and still not ready for trial.

The Court held that the defendant's deliberate, willful, and contumacious disregard of judicial process and rights of the opposing parties justified the most severe sanction.

> Having determined that Piper intentionally destroyed documents to prevent their production, the entry of default is the appropriate sanction.
>
> \*   \*   \*   \*   \*   \*
>
> The policy of resolving lawsuits on their merits must yield when a party has intentionally prevented the fair adjudication of the case.

*Id.* at 486.

In dicta, the Court noted:

> This is not a case in which the client is blameless and the attorney is solely responsible for the discovery violations.

*Id.* at 489.

Similarly, *Synanon Church v. United States,* 579 F.Supp. 967 (D.D.C.1984), involved an action against the IRS because the tax collector had revoked its tax-exempt status. The District Court found that plaintiff had systematically destroyed documents that would verify the position of the IRS, i.e., that it should no longer enjoy its tax exemption as a charitable, religious organization. The Court, relying on *Hazel-Atlas, supra,* dismissed the case with prejudice due to plaintiff's fraud upon the court, and held:

> More than mere fraud between the parties, or an isolated instance of perjury, plaintiff has compounded its "unconscionable plan," *England v. Doyle,* 281 F.2d 304, 309 (9th Cir.1960), by its indisputable misconduct before this court, as outlined below.

*Id.* at 972.

The defendant cites a number of cases that would seem to support his position. In *Young v. Curgil,* 358 So.2d 58 (Fla.App. 1978), a Florida state trial court dismissed plaintiffs' tort claim for injuries arising out of an automobile accident. The court found that the plaintiffs had colluded to present a fraudulent claim to the court.

The Florida Court of Appeals reversed, holding that the facts did not rise to the level of fraud or collusion requiring dismissal by the court.

Again, in *Lockwood v. Bowles,* 46 F.R.D. 625 (D.C.Cir.1969), a declaratory judgment action was brought by two alleged children of their deceased father. Based on testimony in 1954 of the decedent's widow that she had been sterilized in 1910, thereby eliminating the possibility that she could have borne the two children in question, the children were adjudged not to be the heirs of the decedent.

Eleven years later (1965), it came to light that the hospital records proving the mother's sterilization had been altered, and the mother had committed perjury in the 1954 trial.

In denying relief under FRCP 60(b)(3) and in refusing to reopen the 1954 judgment, U.S. District Judge Aubrey Robinson, quite in passing, observed, "Perjury does not constitute 'fraud upon the court.'" *Lockwood,* 46 F.R.D. at 628. But the ultimate decision was based on laches and the principal witnesses were either dead or incompetent. Judge Robinson is a highly respected judge, but this Court has difficulty with his conclusion when held to the light of facts of this case: (1) back-dated letters filed into the record through the discovery process and, (2) the willful production of perjured testimony. The Florida decision is similarly unpersuasive.

Defendants cite *Phoceene Sous-Marine v. U.S. Phosmarine, Inc.,* 682 F.2d 802 (9th Cir.1982). This case involved a defendant who perpetrated a fraud upon the Court in an effort to delay a scheduled trial date. The fraud was a bogus telegram sent to the Court from the defendant while in France. The telegram advised that the defendant was too ill to attend his trial and would be incapacitated for forty-five (45) days. It was actually sent by the defendant's sister, who signed the name of a doctor who had not examined the defendant as of the date the telegram was sent.

The District Court entered a default judgment against the defendant as a sanc-

tion for deceiving the Court. However, the Ninth Circuit reversed the dismissal because defendant's deception was wholly unrelated to the merits of the action. The record indicated that defendant willfully deceived the Court because he wanted to delay his trial, a collateral matter.

The Ninth Circuit reiterated its previous definition of "fraud on the court" as "an unconscionable plan or scheme that is designed to improperly influence the court in its decision." *England v. Doyle*, 281 F.2d 304, 309 (9th Cir.1960). The *Phoceene* Court somewhat *reluctantly* concluded that entry of default judgment in this particular instance was "inconsistent with the requirements of due process," 682 F.2d at 806, and observed that courts do have inherent power to dismiss an action or enter a default judgment, but that this power is limited by the requirements of due process. The distinction seems to be that the deception addressed a *procedural* matter—a trial date—and did not go to or affect the merits of the claim.

■ When the contumacious conduct of Snowden is held to the light of *Hazel-Atlas Co, supra,* and its progeny we must conclude that a fraud was practiced upon the Court and the defendants' answer and counterclaim must now go aglimmering. In such instances the dismissal is authorized through the inherent power of the Court to protect the integrity of its proceedings. The defendant Snowden has practiced the fraud and we have no evidence now to believe that Doherty participated in it.

**B. Liability of L.P. Doherty—The "Silent Partner."**

The Court now turns to the argument of the defendant L.P. Doherty that his portion of the counterclaim should not be dismissed because of the conduct of his partner, H.E. Snowden.

To summarize, plaintiffs contend that Snowden has acted as the partner, agent, and attorney-in-fact for Doherty in all matters pertaining to their joint interests in PELERIN and the pursuit of their claims under their policies of insurance.

Consequently, the issue for the Court's determination is what degree of responsibility must Doherty bear for the acts of his partner and what sanctions would be appropriate for the acts of his business partner.

The plaintiffs rely on *Fightmaster v. Leffler,* 556 S.W.2d 180 (Ky.App.1977), and the Uniform Partnership Act for the proposition that Doherty is bound by the acts of Snowden and must therefore suffer the consequences of Snowden's conduct.

*Fightmaster, supra,* involved a widow who was hoodwinked by a questionable real estate entrepreneur/developer (Leffler), who subsequently conspired with another realtor/developer (Greenberg) to virtually steal the poor widow's property. The Boone Circuit Court found that Greenberg, as Leffler's partner, had no actual or constructive notice of the fraud Leffler perpetrated upon the plaintiff. However, the Court of Appeals of Kentucky reversed, holding that Leffler's fraud was imputed to his partner Greenberg. The court said, "Actual notice of fraud is seldom capable of proof by direct evidence and customarily circumstantial evidence must be relied upon." *Id.* at 181. The court further observed:

> Constructive knowledge or imputed fraud and breach of trust is a different matter. The courts will view confidential relationships with great suspicion and diligence and will require a difference [sic] set of standards in those instances.

*Fightmaster,* 556 S.W.2d at 182.

Finally, the court, after reviewing the Uniform Partnership Act (K.R.S. 362.205–362.220), concluded:

> Thus it is clear that one partner is bound by the knowledge of another, bound by his wrongful and fraudulent act, bound by his breach of trust.

*Id.* at 182.

Plaintiffs also rely on *Keck v. Wacker,* 413 F.Supp. 1377 (E.D.Ky.1976), in support of their argument that Doherty is liable for the acts of Snowden. *Keck* involved a situation where a purchaser sought to rescind the purchase of the mare PLAGE, on the

grounds that he had received non-conforming goods, goods contrary to that which the buyer thought he had purchased in reliance on information contained in the Keeneland Sales Catalogue. The mare was listed as being *barren*, but the fact was that PLAGE had previously been pregnant and aborted. When this occurs, the mare is not said to be barren.

Judge Siler, now Chief Judge of this Court, held that the sale of PLAGE should be rescinded and declared null and void. In addressing the buyer's claim for fraud, the Court found all the elements of actionable fraud·present except for *scienter*. The Court was of the opinion that recision of the sale contract made the buyer whole; therefore, the fraud claim was not the highlight of the case. However, the Court noted in passing that had actionable fraud been found the principal would have been liable for the fraudulent acts of his agent, Claiborne Farms, even though he did not know of the misrepresentation. *Keck v. Wacker*, 413 F.Supp., at 1383.

In opposition to these cases, Doherty relies upon the authority of *Home Insurance Company v. Cohen*, 357 S.W.2d 674 (Ky. 1962), wherein the court held that a false statement by a son of an insured did not bar recovery under the false swearing provision of the insurance policy. In *Cohen*, the insureds were a husband and wife and their son was the one who apparently set fire to the dress shop.

Doherty's reliance on *Cohen* is misplaced in that it misses the issue before the Court. Doherty's reply addresses *policy defenses*, rather than partnership responsibility and the sanctions that may be vicariously imposed upon one partner for the wrongful acts of another.

Doherty cites, *Morgan v. Cincinnati Insurance Company*, 307 N.W.2d 53 (Mich. 1981), which again speaks to policy defenses rather than partnership responsibility. The *Morgan* court held that the rights between an insurer and an insured are determined by the provisions of the contract and are not affected by the manner in which the insureds hold title to the insured property. The issue before the Court regarding

Doherty is whether the acts of one partner can be imputed to another partner. Therefore, these precedents concerning policy defenses are of little value.

■ In consideration of the Uniform Partnership Act and the foregoing discussion of relevant case authority, the Court has no doubt that the acts of Snowden must be imputed to his partner Doherty, who has remained a silent partner throughout. The fact is that Doherty shunned any involvement in this litigation up until the point in time when it became apparent that, as Snowden's partner, he would have to share the responsibility for Snowden's conduct and lose his counterclaim. As previously noted, the Court is not persuaded by Mr. Doherty's eleventh-hour attempt to be absolved from any liability for Snowden's actions when he has acquiesced (at least by silence) in Snowden's conduct concerning PELERIN from day one.

At the last evidentiary hearing held on April 25, 1986, the Court delivered an oral opinion indicating that defendants' counterclaim would be dismissed and further advised that sanctions, (attorney fees and costs) would be imposed against the defendant Snowden. The Court indicated at that time that monetary sanctions would *not* be imposed on Doherty, but his counterclaim would be lost.

·■ The Court remains of the opinion that since (1) Snowden has been the active partner who has perpetrated the fraud upon the plaintiffs and the Court, and (2) the record indicates that Doherty has taken no affirmative action at any time concerning (a) the purchase of PELERIN, (b) the filing of the claim with the plaintiffs, and (c) any phase of this litigation, it would be inequitable for the Court to impose *monetary* sanctions on Doherty.

On the other hand the Court is of the opinion that defendants' counterclaim must be dismissed. Due to the fact that Snowden and Doherty were partners in PELERIN, Snowden's actions must be imputed to Doherty. Inasmuch as Snowden has been Doherty's partner, agent and attorney-in-fact, Doherty cannot now expect to

be escape accountability for Snowden's activities throughout this litigation. He was quite prepared to accept the benefits. It is a bed of his own making.

Moreover, the Court finds no merit in Doherty's argument that his rights under the subject insurance policies would be unduly prejudiced by the dismissal of the defendants' counterclaim against the plaintiffs. If Snowden acted in excess of powers granted to him, Doherty has the right to seek redress from his agent if he can prove that he was himself blameless. The Court therefore concludes that dismissal of the defendants' counterclaim does not leave Doherty without a remedy or deprive him of any right to make himself whole in light of the liability he has incurred as a result of Snowden's misconduct. 60 *Am.Jur.*2d Partnership § 114 at p. 40.

## C. Sanctions.

What sanctions then, could be imposed that would impress a gentleman who would pay $2,000,000.00 for a horse. A dismissal of the counterclaim for $1,450,000.00 insurance coverage might seem to be quite sufficient. On the other hand, the Court may have erred in overruling plaintiffs' motion for directed verdict. In that event, defendants had that loss coming anyway.

Defendants complain bitterly that they desire to pursue their claim against the plaintiffs for the insurance coverage. But as a practical matter, another trial would be a complete waste of time. In our view, it would be very unlikely that the counterclaim could be won no matter how skillful the trial attorney. Throughout these proceedings the defendants have claimed that PELERIN was worth $3,000,000.00 at the time of his death. This was based upon expressions from other horsemen that PELERIN could be successfully syndicated by selling 40 shares at $75,000.00 each. The credibility of these opinions would be put squarely in issue. The backdated letters and the perjury/recantation of Casse would be relevant upon a retrial. *A fortiori,* these issues would become the focal point of the trial. A retrial would constitute a monumental waste of the Court's time and the parties' money.

The remedy must serve as a deterrent to the defendant and all others that might be similarly tempted to manufacture documentary evidence and attempt to cover it up with perjured testimony. The remedy must be sufficient to serve universal notice that this conduct will not be tolerated. The remedy therefore must go further than a dismissal of the counterclaim.

Plaintiffs have incurred substantial fees, expenses, and costs to defend the claim for PELERIN'S death. A total sum of $194,131.52 has been expended. Would not this sum be sufficient measure for us to encourage future observance by persons coming into this Court?

The defendants conceded on February 6, 1986, that they expected to pay plaintiffs' costs and expenses incurred in preparation and trial held January 22–28, 1986. A careful review of the entire record indicates that a substantial portion of those expenditures were incurred during the final weeks leading up to the trial. The plaintiff produced witnesses from two continents. The fees and expenses incurred following the mistrial are clearly at defendant Snowden's doorstep.

The remedy must reflect the Court's zealous concern for the integrity—the absolute and unquestioned integrity—of its orderly procedures. FRCP 11, as recently amended speaks to this view.

The remedy must assure all those who seek the resolution of their disputes in this Court and these persons include the rich, as well as the poor—the Lexingtonian—the stranger, that this ill-conceived and poorly executed enterprise shall not be repeated.

To award plaintiffs' costs, expenses and attorney fees incurred to defend the entire action would seem to be an appropriate sanction in response to the theatrics we have witnessed here. This sum while substantial is fully justified in the Court's mind.

The gravity of Snowden's conduct has been fully described and discussed herein and this opinion will not be burdened by

further lamentations. What is lacking is defendant's testimony, subject to cross-examination, to explain why he manufactured the back-dated letters and orchestrated Casse's admitted perjury. His stone-like silence since January 28, 1986, is remarkable. His rebuttal has consisted only of motions to "re-consider" the Court's indicated ruling delivered from the bench on April 25, 1986.

The Court has inferred Snowden's complicity from his failure to deny or explain the charges that were made on January 29, 1986, and April 25, 1986. And yet there has been no explanation. He has done nothing but continually lob "live shells" into the record.

In this regard, mention should be made of 37 letters from his friends and neighbors that accompanied the motion to reconsider. They were from lawyers, doctors, bankers, (creditor banks), preachers, a retired circuit judge from Chicago, Illinois, and well known personalities with national reputations in the horse industry.[3] The messages were all laudatory and the usual comment was:

> I have known Harold Snowden for more than thirty years. I have bought several stallion shares and numerous seasons from him. He has always been fair and honest with me.

None of the letters were addressed directly to the Court. We do not know whether these authors actually knew the use to which the letters would be put at the time they were written. Suffice to say that there have been too many epistles from too many celebrities. All have been stricken. They have no place in this record. They were all extraneous and irrelevant to the true legal issues at hand. The letters were not a very good idea.

Now, while the sanctions should carry some sting, still the penalty should not be financially ruinous. The defendant has submitted a comprehensive financial statement, as of April 25, 1986. The current values of assets were estimates furnished by Snowden. The Court is comfortable in the thought that these values would be conservative. His net worth is into seven figures. A penalty of $194,131.52, when compared to his *net* worth, would amount to something just under a "tithe."

## CONCLUSION

The defendant, Harold E. Snowden, has used extremely poor judgment in this case. It would seem that each wrong turn was the antithesis of his entire life. It would be most surprising if he would ever repeat these mistakes.

The result reached here must reach out, however, to others that might be similarly tempted. All persons who would buy, sell, race, breed and insure thoroughbred horses in Kentucky must be able to do so in complete confidence that those they deal with in this community in the industry will always be fair dealing and above board. The reason is obvious. This community is in the center of the industry that Mr. Snowden represents. Its roots here are historic. It is a foundation block of the Bluegrass Area. The reputation of the industry must be protected, and it would be impermissible to permit any erosion of that reputation, however small.

But in a larger sense the institution this Court represents demands exemplary conduct from all those who are a part of it. And this includes *parties*. It includes laymen untrained in the law. Many times our courts appear indulgent and many would say, to a fault. On rare occasions it appears to be unforgiving and that makes it unfortunate for those caught in its wake. The conduct found to exist in this litigation cannot be ignored.

Accordingly, a judgment in conformity with this opinion shall this day enter.

---

**3.** Included were Charles Wittingham and Willie Shoemaker, the trainer and jockey of FERDI-NAND, 1986 Kentucky Derby winner, and Pat Day, a leading jockey in the United States.