NASCO, INC.

v.

CALCASIEU TELEVISION AND RADIO, INC., et al.

Civ. A. No. 83–2564.

United States District Court,
W.D. Louisiana,
Lake Charles Division.

Jan. 23, 1989.

Neal & Harwell, Aubrey B. Harwell, Jr. and Jon D. Ross, Nashville, Tenn., Scofield, Bergstedt, Gerard, Mount & Veron, and David L. Hoskins, John B. Scofield, Lake Charles, La., for plaintiffs.

Rubin, Curry, Colvin & Joseph, Michael H. Rubin and Richard A. Curry, Baton Rouge, La., for Mabel Christine Baker.

Camp, Carmouche, Barsh, Hunter, Gray, Hoffman & Gill, Gary L. Boland, Baton Rouge, La., Russell T. Tritico, Lake Charles, La., for Calcasieu Television and Radio, Inc. and G. Russell Chambers.

Onebane, Donohoe, Bernaed, Torian, Diaz, McNamara & Abell, John G. Torian, John Keller, P.O. Drawer 3507, Lafayette, La., for A.J. Gray.

Nick Canaday, Baton Rouge, La., Adams & Reese, Michael G. Crow, New Orleans, La., for Edwin A. McCabe.

## OPINION

NAUMAN S. SCOTT, District Judge.

This matter is before us on a Motion to Fix Compensatory Damages Pursuant to Contempt Judgment, To Fix Appellate Sanctions, and To Impose Sanctions.[1] The mover is NASCO, Inc. (NASCO). The respondents include G. Russell Chambers (Chambers), A.J. Gray, III (Gray), Edwin A. McCabe (McCabe), Mabel Christine Baker (Baker), and Richard A. Curry (Curry).

Nasco filed this action in diversity on October 17, 1983 for the specific enforcement of an August 9, 1983 Purchase Agreement providing for the sale of television station KPLC–TV in Lake Charles, Louisiana to NASCO and for injunctive relief to prohibit the transfer of the properties to any third party in violation of the Purchase Agreement. Due notice of NASCO's application for injunctive relief was given to the attorneys for sellers prior to Sunday, October 16, 1983, and sellers on

that day created a trust and transferred properties to the trust in violation of the Purchase Agreement and for the admitted purpose of placing these properties beyond the jurisdiction of this Court. The defendants in the underlying action are Calcasieu Television and Radio, Inc. (CTR),[2] the owner and defaulting seller; Chambers, the sole shareholder and sole Director of CTR, who signed the Purchase Agreement on behalf of CTR and in his individual capacity, and who caused the corporation to breach the Agreement; and Baker, Chambers' sister and the Trustee of the Facility Trust, an entity created by Chambers on the eve of this litigation to receive simulated ownership of certain station properties in order to prevent judicial enforcement of the sale.

The litigation was tried to the Court without a jury on April 17, 1985. NASCO prevailed.[3] This Court's refusal to stay execution of the judgment pending appeal was sustained by the Appellate Court.

On August 6, 1986, the United States Court of Appeals for the Fifth Circuit, at the close of oral argument, ruled from the bench, *per curiam*, affirming this Court's judgment on the merits, declaring the defendants' appeals to be frivolous, imposing appellate sanctions against Chambers and Baker pursuant to Fed.R.App.P. 38 in the form of attorney's fees and double costs, and remanding the case with instructions to fix the amount of the appellate sanctions and to determine whether further sanctions should be imposed against the defendants and/or their counsel for the manner in which the litigation was conducted in the district court.[4]

---

**1.** By order dated February 1, 1988, we fixed the contempt damages previously awarded to NASCO in the amount of $6,233.27, together with legal interest thereon at the rate of 7.14% per annum from February 1, 1988, until paid. (The $6,233.27 amount includes $4,754.00 in attorney's fees and expenses and $1,479.27 in out-of-pocket expenses incurred by NASCO's director James Smith in testifying at the contempt hearing). That issue is therefore not addressed herein.

**2.** Calcasieu Television and Radio, Inc. (CTR), an original defendant in the underlying litigation, was liquidated following the sale of KPLC–TV to

NASCO. It is thus not a respondent in the instant matter.

**3.** This Court issued its Opinion on the merits on November 8, 1985, *NASCO, Inc. v. Calcasieu Television and Radio, Inc.,* 623 F.Supp. 1372 (W.D.La.1985), and Judgment was signed on November 27, 1985.

**4.** See *NASCO, Inc. v. Calcasieu Television and Radio, Inc.,* 797 F.2d 975 (5th Cir.1986) (*per curiam* ) (unpublished order); *Id.* (5th Cir. Aug. 11, 1986) (*per curiam* ) (unpublished order amending Order of Aug. 6, 1986); *Id.* (5th Cir.

Continued resistance by Chambers, his employees and agents, including McCabe after our November 27, 1985 judgment on the merits, delayed completion of the sale until August 27, 1986. Thereafter NASCO's claims for damages under La.C.C. Art.1986 (specific performance) as a result of Chambers' breach of the agreement were disposed of before NASCO could prepare and file, on December 29, 1987, the motion now before us, first, to fix the amount of the appellate sanctions imposed against Chambers and Baker by the Fifth Circuit, and, second, to impose appropriate sanctions against the respondents, including Chambers, Gray, McCabe, Baker, and Curry, for the manner in which the defense of this action was conducted in the trial court. NASCO seeks *appropriate* sanctions—including all attorney's fees, costs, and expenses it incurred during the course of the entire proceedings. These sanctions are sought under the aegis of the Court's inherent equitable powers, and the provisions of 28 U.S.C. § 1927 and Fed.R.Civ.P. 11.

An evidentiary hearing was held on April 11, 1988. Suggested findings and conclusions as well as authorities (including additional authorities requested by us on December 12, 1988) have been submitted by all parties and are now before us.

## ISSUES

The issues before the Court are as follows:

A. Fixing the amount of attorney's fees and of double court costs on appeal decreed as sanctions by the Court of Appeals.

B. Determining whether sanctions are appropriate for the manner in which this proceeding was conducted in the district court from October 14, 1983, the time that plaintiff gave notice of its intention to file suit to this date and, if sanctions are appropriate, to determine what party or parties should be sanctioned and the character of sanctions to be assessed.

August 27, 1986) (*per curiam*) (unpublished

## FINDINGS OF FACT

### A. *Preliminary History:*

1. On August 9, 1983, NASCO, as buyer, and CTR and Chambers, as sellers, entered into an Agreement to convey the television facilities and the broadcast license of KPLC–TV in Lake Charles, Louisiana for the purchase price of $18 million dollars. The Agreement has never been recorded in Calcasieu and Jefferson Davis Parishes where the properties are located.

2. The Agreement provided that time is of the essence in the performance of the Agreement, Paragraph 31, and provided specifically that consummation of the Agreement is subject to the approval of the Federal Communications Commission; that the parties shall proceed as expeditiously as possible to file all requisite applications and other necessary instruments, to process said applications with all reasonable diligence and to cooperate and use their best efforts to obtain the requisite consent and approval of the Commission and to carry out the provisions of the Agreement. In no event was the joint application to the Commission to be filed later than forty-five days from the date of the Agreement, namely September 23, 1983.

Chambers, the sole stockholder and sole member of the Board of CTR, and his attorney, Jonathan Golden, who was also assistant secretary of CTR, negotiated and consummated the Agreement on behalf of CTR. In fact, they were the only CTR employees or representatives having knowledge of the existence of the Agreement until Chambers' meeting with NASCO representatives in Lake Charles, Louisiana on August 22, 1983.

3. On that date, Brian Byrnes and Jim Smith, who signed the Agreement on behalf of NASCO, visited KPLC–TV at the invitation of Chambers for the purpose of drafting an appropriate public announcement of the Agreement. Until he left the meeting, Chambers had been most cooperative in carrying out the Agreement.

opinion affirming judgment on the merits).

Rita Guillory,[5] President of CTR, had no part in the negotiations and was not consulted regarding the Agreement. At this meeting she learned for the first time that KPLC–TV was to be sold and that she would lose her job as President. CTR's cooperation ceased the minute that Chambers left the meeting. Byrnes and Smith left and no representatives of NASCO would be present at the station again until sometime after September 23, 1983.

4. Chambers called Bill Cook, chairman of NASCO, on August 29, 1983 and tried to talk him out of going through with the Agreement, offered to reimburse all of NASCO's expenses and pay some additional money. Cook declined.

5. On September 2, 1983, NASCO informed CTR and Chambers that NASCO's portion of the Assignment Application was ready and in suitable form for filing with the FCC.

6. On or about September 7, 1983, Chambers had a telephone conversation with Brian Byrnes in which he asked "What would you say if I didn't file?" Byrnes replied that NASCO had been ready to file its portion of the FCC application since September 1 or 2, and that he would be very disappointed.

7. Byrnes and Chambers spoke again on Monday, September 12, 1983. When Chambers asked what Byrnes thought of Chambers' remark on September 7th, Byrnes replied that, based on his brief contacts with Chambers, he thought that Chambers would do what the Agreement provided. Chambers answered that he recognized that he (CTR) had a contractual obligation to file CTR's portion of the FCC application.

8. In a letter (Ex. P2) dated September 16, 1983, NASCO (Brian Byrnes) referred to the content of the conversations (paragraphs 5–7 supra) in detail, and again notified CTR and Chambers that the assignee's part of the application had been ready and in suitable form for filing since September 2nd and requested that CTR "immediately

prepare, have executed and forwarded the assignor's portion of the assignment application prior to September 23, 1983."

Chambers replied on September 21, 1983 (Ex. P3) that the Agreement speaks for itself and that he understood that his "attorney has contacted your attorney." He did not deny any of the content of the September 16, 1983 letter (Ex. P2).

9. On September 23, 1983, NASCO's FCC counsel, John Stewart, was informed by Chambers' (CTR) FCC counsel, Roy Russo, that the assignor's portion of the Application would not be filed on that date. On that same date Stewart caused a letter to be hand delivered to Russo, stating again that NASCO was ready and willing to file the assignee's portion of the Application and that Russo should notify him if and when the assignor's portion was received.

10. From August 9, 1983, the date that the Agreement was executed by the parties, until September 23, 1983, the date by which CTR was to submit its portion of the FCC application, there was no default or violation of the Agreement on the part of NASCO. In fact, all parties, including Chambers, were performing and ready to go forward on August 22, 1983. When Chambers called Bill Cook on August 29, 1983 (see paragraph 4 supra), they talked some forty-five minutes. Chambers did not complain then or thereafter of the violation of any pre-August 9, 1983 understanding or of the Agreement or interference with station operations or harassment of personnel or any difficulty with ascertainment interviews—all of which have been alleged by defendants following the institution of this suit. He simply tried to generate with Cook some terms on which he could buy out of the Agreement. Cook was adamant.

11. In Chambers' conversations and correspondence with Byrnes after August 29, 1983, he never once alluded to any such breaches by NASCO, he talked only of an unrelated bond problem as the reason for

5. Rita Guillory became Rita Chambers after her marriage to G. Russell Chambers on or about

November 1983.

his admitted reluctance to file CTR's portion of the FCC application. Although he admitted that he and CTR were bound by the Agreement (now a stipulated fact, see paragraph 25 infra), Chambers suggested on September 7, 1983 for the first time that he (CTR) might refuse to file timely his portion of the FCC application (paragraphs 6, 7 and 8 supra). His (CTR's) acts after August 29, 1983 finally culminated in his (CTR's) unjustified and arbitrary refusal to file CTR's portion of the FCC application by September 23, 1983. This refusal was a deliberate violation of their obligations under Paragraphs 6 and 31 of the Agreement. Their refusal or failure to file was in absolute bad faith.

12. Several weeks prior to October 17, 1983 Chambers sought the advice of Camp, Carmouche, Barsh, Hunter, Gray & Hoffman, his Lake Charles attorneys who had not represented him previously in this matter, to discover a way to defeat the August 9, 1983 Agreement and retain title and possession of the properties described therein for CTR. Upon investigation and discovery that the Agreement was not recorded, Gray, who had assumed the duties of trial attorney, suggested that the Public Records Doctrine might be an effective solution. The plan was simple. If CTR could sell the station site and the tower site to a third party prior to the recordation of the Agreement or the issuance of an injunction, the Court would be forced to recognize that title and possession of the properties was no longer in CTR; was beyond the jurisdiction of the Court so that the Court could not enforce specific performance against CTR.

B. *The Initial Fraud:*

13. On Friday, October 14, 1983, counsel for NASCO notified Jonathan Golden, an attorney for Chambers and CTR and an officer of CTR, that it would file suit in the United States District Court for the Western District of Louisiana in Alexandria,

Louisiana on Monday, October 17, 1983, seeking specific performance of the Purchase Agreement and that counsel for NASCO would appear in Alexandria at approximately noon on that date to request injunctive relief to preserve the status quo by enjoining the alienation or encumbrance of the subject properties until a judicial resolution of the dispute could be obtained. This information was transmitted to Chambers through his Lake Charles attorneys on Saturday, October 15, 1983.

This notice to the defendants Chambers, CTR and Gray, pursuant to the requirements of Fed.R.Civ.P. 65(b) and Rule 11 of the Local Rules of this Court, is designed to allow a defendant in an application for a temporary restraining order to be present at the hearing and defend his interests.

On the afternoon of Sunday, October 16, 1983, Chambers and Gray knowingly and deliberately took advantage of this notice to form and set into motion an illegal and fraudulent scheme and conspiracy which they have admitted was designed to place the operating properties of CTR beyond the reach and jurisdiction of this Court through the medium of the Louisiana Public Records Doctrine and to deprive NASCO of a judicial determination of its rights to specific performance and still maintain CTR in possession and in a position to continue its operations without interruption.[6] Their first act in furtherance of the conspiracy was the formation and execution of an act of donation in trust with a corpus of $1,000.00;[7] appointing Chambers' sister, Baker, as Trustee and naming Chambers' three adult children as beneficiaries. Chambers, Rita Guillory and Gray were fully aware on October 16, 1983 that the two tracts of land on which the TV station and the transmitters were located were to be sold to NASCO under the Agreement of August 9th. Yet, contemporaneously with the drafting of the Trust, Chambers, the sole member of the Board of Directors and the sole stockholder of CTR,

---

**6.** *See* Transcript of April 11, 1988 hearing pp. 114–118; 152–159.

**7.** There is evidence that the $1,000 corpus was never paid into the Trust. This omission may

have rendered the Trust invalid. La.R.S. 9:1731. *See* Restatement 2d Trusts § 74 and Comment (b) to La.R.S. 9:1822.

by resolution directed Rita Guillory, the President of CTR, to execute duplicate warranty deeds conveying the two tracts to Baker, Trustee, for a recited consideration of $1.4 million dollars. The president of CTR complied.

14. On the evening of Sunday, October 16, 1983, Chambers telephoned his sister, Baker, in Birmingham, Alabama and informed her of the creation of the Trust and that it was his wish that she act as Trustee. He did not refer to the duplicate deeds which had been executed by Rita Guillory on behalf of CTR. After she consented to be Trustee, Chambers told Baker that he would be coming to Birmingham the next day to have her sign some documents.

15. The deeds were recorded at 8:30 a.m. on Monday, October 17, 1983; with no signature by the purchaser, Trustee Baker; with none of the consideration having been paid, and with CTR still in undisturbed possession despite the recordation of the deeds. All this was accomplished at the sole direction of Chambers and Gray.

16. Late on the morning of Monday, October 17, 1983, NASCO's counsel appeared before us in Alexandria, Louisiana and filed NASCO's complaint against CTR and Chambers seeking as part of the relief against those parties specific performance of the Agreement and a Temporary Restraining Order (TRO) to enjoin those parties from alienating or encumbering the properties covered by the Agreement. Gray had requested by a telephone call to the Clerk of Court's office that morning that he be informed when NASCO's counsel arrived. We personally called Gray, informed him that NASCO's counsel were present and that NASCO's counsel had stated to us that notice had been given to Gray of the injunctive relief sought by NASCO. Gray did not plead surprise or

lack of notice. Had he done so, we, considering the substance of the relief sought, would have delayed action until he could be present. This was not considered, however, because Gray stated that he did not intend to be present and that he was making no statements or representations on behalf of his client. However, he did participate fully in the conference. We informed him of the nature of the injunctive relief sought, read to him verbatim that section of the suggested TRO which pertained to inspection of records. Gray suggested alterations, all of which were agreed to by NASCO's counsel. They were incorporated into the TRO which was then signed by us, with Gray's consent, at 1:34 p.m. A hearing for a preliminary injunction was set for October 24, 1983. Gray participated in the TRO conference by telephone as fully as he could have done if personally present. His participation was, in effect, a waiver of notice. Although Gray, during this discussion, was then deeply involved in Chambers' scheme to place the property beyond the reach and jurisdiction of this Court, he made no mention of this to the Court.[8] Ex.P. 10.

17. At or about 4:30 on the afternoon of Monday, October 17, 1983, after the deeds had been recorded, and after the TRO had been signed in Alexandria, Chambers flew to Birmingham, Alabama and met Baker at the airport. He directed her to sign her acceptance of the office of trustee and the $1.4 million note to CTR. She did as directed. She does not recall being told about the sale or receiving a copy of it. She signed the note without knowledge of what she was signing, what it was for, or how she was going to pay it. Baker was given no explanation and she did not ask for any.

---

**8.** Unbeknownst to the Court, Gray surreptitiously tape recorded these telephone conferences. Transcripts of those tape recordings were attached as exhibits to Chambers' Memorandum in Opposition to Request For Sanctions. *See* Chambers Memorandum Exhibit A. Those transcripts reveal a telling exchange during the course of Gray's discussions with the Court on the scope of the proposed injunctive strictures:

Judge [Scott]: I have an understanding of the representation bid [sic], *you are not trying to sell to someone else.*
Gray: *I have made no representation.*
*Id.,* p. 2 (second conversation) (emphasis added).
No clearer opportunity to reveal the truth could have been offered to Gray. No clearer evidence of *deliberate* and *devious* concealment could be found.

18. On Tuesday, October 18, 1983, Gray admitted by letter the recordation of the duplicate deeds at 8:30 a.m. on Monday, October 17, 1983 and that he had intentionally concealed that fact from the Court prior to, during and after the issuance of the TRO.

19. Chambers' attorneys prepared a leaseback agreement from Baker, Trustee, to CTR covering the same properties allegedly conveyed to Baker in the duplicate deeds of October 16, 1983. Rita Guillory signed this instrument on behalf of CTR on October 22, 1983 and forwarded it to Baker, directing her to sign and return it. Baker had no notice or other reason to expect the receipt of this lease. Baker knew nothing of its terms or contents and she had no part in any negotiations. No explanation accompanied the lease; Baker had no conversation with or advice from Rita Guillory, Chambers or anyone else. She simply signed and returned the lease on October 25, 1983. It is not shown in the record, even at this late date, that Baker was aware of the October 16, 1983 "sale" from CTR or the identity of the property covered by that "sale."

20. On Monday, October 24, 1983, we granted a preliminary injunction against CTR and Chambers, and entered a second temporary restraining order directed against Baker to prevent her from selling, transferring, or in anyway encumbering the CTR properties. Mr. Gray appeared as counsel for CTR and Chambers but denied representation of Baker. NASCO's counsel, having assumed Gray would represent her, then made attempts to contact Baker prior to the Court's issuance of the order. Failing such notice, the Court, in the interest of justice, granted such TRO against Baker, as Trustee of the Facility Trust at 10:37 a.m. on October 24, 1983.

21. At this same meeting, although we were not yet aware of the lease-back agreement, we, for the first time, warned Gray that the acts of Chambers and himself on October 16 and 17, including Gray's concealment of those events, were reprehensible and unethical and that no acts of that nature should be repeated in the future.

We felt that Gray would abide by that warning.

C. *The Pretrial Skirmishes:*

22. Our expectations were short-lived. In November 1983 Chambers, acting on the advice of Gray, refused to allow an inspection of corporate records in direct defiance of the standing preliminary injunction. The ensuing contempt proceedings, *NASCO, Inc. v. Calcasieu Television & Radio, Inc.*, 583 F.Supp. 115 (W.D.1984), vindicated NASCO's rights, but only at the price of significant expense, delay, and waste of resources. That price was made more dear by Gray's vigorous prosecution on behalf of Chambers of two separate and independent appeals which were dismissed by the appellate court without consideration of the merits. *See NASCO, Inc. v. Calcasieu Television and Radio, Inc.*, 752 F.2d 157, 157–58 (5th Cir.1985).

23. Subsequently a series of meritless motions and pleadings and delaying actions were initiated by defendants.

a. Two motions for summary judgment filed by Gray and Boland on behalf of Chambers (CTR).

b. Motion for summary judgment filed by Curry on behalf of the Trustee followed by Motion to Strike and a supplemental motion thereto; a motion to reconsider (no new grounds).

c. Motion for protective order and clarification filed by Gray on behalf of Chambers (CTR).

d. Chambers (CTR) through Gray filed baseless charges and counterclaims against NASCO alleging fraud, harassment, interference with TV station operations, spreading of misinformation, public disapproval of the sale and of plaintiff as owner-operator of the station. Also charged were unnamed breaches of the Purchase Agreement by NASCO and NASCO's disregard for a non-existent oral side-agreement with Chambers (CTR).

e. Chambers (CTR) through Gray injected pointless new issues: NASCO's conduct of its FCC ascertainment survey; its ability to pay the purchase price; its plans for the

future management of the station; its commitment to the community interest.

f. Absolutely needless depositions of officials of the bank that was to finance the purchase price were noticed by Gray and taken by McCabe on behalf of Chambers (CTR).

g. Depositions of the entire NASCO board of directors were noticed and five were taken.

h. Throughout the course of these proceedings prior to the trial on the merits, Chambers (CTR) and Gray sought repeatedly, sometimes successfully, continuances of trial dates, extensions of deadlines and deferments of scheduled discovery.

All of the motions mentioned above in a, b and c required research and opposition by NASCO and consideration by the Court. All were filed in absolute bad faith by attorneys who conceived "The Initial Fraud" (Gray) or had become intimately familiar with it through instruction, the record and depositions (Curry). Chambers (CTR), Baker (Trustee) and these attorneys, as a basis for these motions, brazenly and deliberately urged upon this Court as uncontroverted fact, the attempted simulated and fraudulent sale to the Trustee Baker which all of them knew was fraudulent and was attempted for the sole purpose of depriving NASCO of its right to specific performance by placing the property beyond the jurisdiction of the Court.

The charges mentioned in d above were deliberate untruths and fabrications by Chambers. They were, on their face, improbable and unrealistic. Yet these attorneys, without any investigation whatsoever, filed them. We find, under the circumstances, that these attorneys knew, at the time that they were filed, that they were false.

The acts described above in e, f, g and h were simply part of the sordid scheme of deliberate misuse of the judicial process; to defeat NASCO's claim by harassment, repeated and endless delay, mountainous expense and waste of financial resources.

24. Having held a pretrial conference and several status conferences and ruled on several motions in preparation for a trial on the merits set for February 27, 1985, we were confronted on January 28, 1985 by a motion filed on behalf of Chambers (CTR) by Gray to recuse the trial judge for bias and prejudice. An expedited evidentiary hearing was had; we considered and denied the motion. A writ of mandamus to compel disqualification was filed with the U.S. Court of Appeals for the Fifth Circuit by Gray for Chambers (CTR). Curry, on behalf of the Trustee, filed an "answer" in which he urged the granting of the writ. The writ was denied as being meritless, but trial on the merits again was delayed.

25. Finally, on the eve of trial, Chambers (CTR), Baker, and their counsel stipulated that the Purchase Agreement was valid and enforceable, and that Chambers (CTR) had breached the agreement on September 23, 1983. No clearer indication could be found that all of the previously asserted affirmative defenses, all of the previously asserted counterclaims, all of the multitudinous pleadings and motions and oppositions prosecuted so fervently by the defendants, were untruths and distortions and were absolutely devoid of substantive merit. Defendants obtained no tactical or strategic benefit by this stipulation. They suddenly were faced with the necessity of producing evidence to sustain the charges and the fact that Chambers' testimony in support of those allegations would be perjury. Of the 100 witnesses listed by Chambers prior to trial, only two appeared to testify. Of all the multitude of allegations and counterclaims asserted by Chambers and filed by Gray and Curry prior to trial, only one defense was actually presented: the Public Records Doctrine defense manufactured as part of "The Initial Fraud".

D. *The Posttrial Skirmishes:*

26. After the April 1985 trial on the merits and during the delay for submission of authorities, suggested findings and conclusions and our consideration of the merits, Chambers (CTR) and his attorneys continued to use every means, every subter-

fuge, every ruse possible to avoid performance of the Purchase Agreement.

a. Chambers, without notice to NASCO, petitioned the FCC for permission to construct a new transmission tower for the station, and to relocate the station's transmission facilities to that site. This would have been a material alteration of the *status quo*. The tower sites would be covered no longer by the Purchase Agreement. Only the informal intervention of this Court, and NASCO's threat of further contempt sanctions, persuaded Chambers to withdraw the application.

b. Following the rendition of judgment on November 27, 1985, Chambers and Baker, acting through Gray and Curry, moved this Court to stay its judgment pending their contemplated appeals. Extensive memoranda, and no less than three status conferences, ensued. All parties having admitted that the Purchase Agreement was legal, valid and enforceable, the Public Records Doctrine having been rejected and all other baseless defenses having been withdrawn, the plaintiff having suffered delay, harassment and enormous expense since October 17, 1983, we refused steadfastly and absolutely to grant a stay. Curry, on behalf of the Trust, filed a petition for a writ of mandamus to the Fifth Circuit in an attempt to *force* this Court to grant the stay. Chambers petitioned the Fifth Circuit directly. Both were denied. Chambers then petitioned (via his Washington lawyers) the Honorable Byron R. White, Associate Justice of the United States Supreme Court, to stay our merits judgment. That petition, too, was denied.

c. During the pendency of the defendants' appeals, Chambers (CTR) renewed his efforts to circumvent the merits judgment by fomenting opposition to the pending application for FCC approval of the transfer of the station license. Specifically, formal oppositions were lodged with the FCC, and were subsequently prosecuted, by two corporate officers of CTR—in direct violation of both the injunctive orders and the merits judgment. NASCO was thus compelled to seek contempt sanctions for a

third time. Again, by informal intervention by us, the oppositions were withdrawn.

d. Gray resigned as counsel for Chambers and CTR on April 2, 1986. Thereafter Chambers (CTR) continued his refusal to begin preparation to close the sale. NASCO, on July 1, 1986, again was forced to seek judicial assistance and hearing was fixed for July 16, 1986. Thereupon Chambers called upon his Boston, Massachusetts attorney, Edwin McCabe, to command his campaign of defiance, delay, harassment and expense. McCabe had represented Chambers (CTR) previously in the pointless depositions of bankers who had done business with NASCO. McCabe proved to possess unethical abilities equal to the job.

e. On July 21, 1986, we sustained NASCO's motion to quash the subpoena duces tecum filed on behalf of Chambers and CTR directing NASCO to produce confidential financial information pertaining to discussions between plaintiff and financing institutions with whom plaintiff had conferred concerning the financing of the purchase price for television station KPLC–TV.

f. At the commencement of the July 16, 1986 hearing we informed McCabe that we had encountered much sanctionable conduct in the trial of this case and we would not tolerate or countenance any additional conduct of that nature, and that the hearing would be limited to the trial of Chambers' (CTR) contention that certain operating equipment, which had replaced equipment listed in Exhibit B on August 9, 1983, should not be included in the sale. McCabe had already filed an opposition and prehearing memorandum, raising a multitude of irrelevant arguments; a request for a trial by jury on the pending motions, and a motion *in limine* to exclude any evidence pertaining to station assets not listed in Exhibit B to the Purchase Agreement. We denied all of these prehearing motions.

g. The July 16, 1986 hearing went into recess for several days and during that recess the defendants unilaterally, and without notice to the Court, or opposing counsel, removed from service *all* of the equipment at issue in the hearing. That

action was undertaken at McCabe's direction and was an attempt by Chambers (CTR) and McCabe to resolve extrajudicially and through self-help the very issues then before the Court. On July 22, 1986, we ordered that the equipment previously removed be returned to service, and to remain so during the remaining pendency of the litigation. The July 16, 1986 hearing was itself a case study in deception. CTR's accountant, and two of its corporate officers (Rita Guillory Chambers, Chambers' wife, and his longtime employee, Albert Smith) gave false and perjured testimony concerning the ownership and use of the disputed assets. Seventeen fraudulent equipment leases were introduced by McCabe to prove that the disputed equipment did not belong to CTR but to another Chambers corporation and was merely leased to CTR. Ultimately these leases were found by us to be "nothing more than instruments of deception."

h. On July 28, 1986—despite the pendency of NASCO's motion for judicial assistance, despite our clear and repeated orders that the *status quo* would be preserved, and despite the fact that we had taken NASCO's motion under advisement for the rendition of judgment—McCabe caused a letter to be sent to NASCO's counsel stating Chambers' unilateral intention to close the sale of KPLC–TV on August 4, 1986, and to convey only those assets listed on Agreement Exhibit B—expressly excluding the disputed equipment that was the subject of the pending motion for judicial assistance. That letter was nothing more and nothing less than an attempt to maneuver NASCO into position for the termination of the sale by Chambers under Paragraph 16 of the Purchase Agreement. On July 31, 1986 we granted NASCO's pending motion seeking relief from the timing and termination provisions of Paragraph 16 of the Agreement.

i. On August 5, 1986, McCabe caused to be filed (1) an appeal from our order of July 31 (granting relief from the timing and termination provisions of Paragraph 16); (2) a separate appeal from our order of July 24, 1986 (ordering Chambers to restore the disputed equipment to service);

and (3) a motion to vacate our merits judgment of November 27, 1985 for the specific performance. On the same date, Chambers' New Orleans counsel moved the Court of Appeals for the Fifth Circuit to upset and continue the oral argument on the pending appeals, then scheduled for August 6, 1986. That motion was summarily denied by the appellate court.

The basis for McCabe's motion to vacate the merits judgment was the termination provisions of the Purchase Agreement; in essence, an argument that NASCO had breached the Purchase Agreement by declining to close the sale on August 4, 1986 in submission to Chambers' unilateral demand, and that, because Chambers had managed to delay both FCC approval of the license transfer and the closing, Chambers was entitled to terminate the contract.

27. This Court throughout this proceeding has attempted to restrain the fraudulent and unethical conduct of the defendants and their attorneys.

a. As previously stated, paragraph 21 supra, we warned Gray of his unethical actions (The Initial Fraud) on October 24, 1983.

b. The judgment of this Court after the contempt hearing a month and a half later was, by its inherent nature, a warning against any similar conduct in the future.

c. Some months after that we called, on our own initiative, a status conference to determine why depositions of a number of bankers had been noticed and whether these were actually necessary. When we were informed by defendants' counsel that the purpose was to test NASCO's ability to meet the $18 million dollar purchase price mentioned in the Purchase Agreement, we informed them that that was not a relevant issue and that a more positive and less expensive way to determine that issue was an offer by defendants to perform the Purchase Agreement. We cancelled the uncompleted depositions consistent with our powers under Fed.R.Civ.P. 26(g). This was another warning.

d. On January 28, 1985, about a month prior to the then current trial date of Feb-

ruary 27, 1985, Chambers and Gray filed a motion to disqualify the trial judge. Although the motion was dismissed by us because the supporting affidavit by defendant Chambers was legally insufficient, we felt that the motion actually was frivolous and had been filed for tactical purposes. We also felt that, because of the nature of the proceeding, a renewal of the warning was inappropriate.

e. We called a status conference on April 8, 1985, nine days prior to the final trial date of April 17, 1985. At this conference we again gave warning and distributed to the attorneys copies of Judge Schwartzer's article, "Sanctions Under the New Federal Rule 11—A Closer Look", 104 F.R.D. 181 (1985).

f. At the commencement of the hearing held July 16, 1986, we again repeated our warning, this time specifically to McCabe. McCabe's reaction is described above, paragraph 26f–i.

28. Little more need be said about the role of Chambers and Gray in this sordid, dishonest and deliberately unethical chain of events called a lawsuit. In the memoranda of authorities submitted by them on the sanction phase of this suit, each vigorously assails the character and credibility of the other as if this automatically places his own character and credibility beyond reproach. But the record itself establishes that both are capable of any fraud that is necessary for a given purpose, and that neither is worthy of belief.

On Sunday, October 16, 1983, one day after they had received notice that NASCO was applying for injunctive relief against CTR and Chambers, Chambers and Gray formed a conspiracy for the sole and dishonest purpose of defeating the Purchase Agreement which both of them knew at the time to be absolutely legal and enforceable. Both of them were admirably equipped to carry out the purposes of the conspiracy since neither of them was restrained by any sense of honesty, integrity or ethics. The very first act of the conspiracy, the so-called Public Records Doctrine defense, set the ethical tone of all of its acts which followed. It was a web of deliberate fabri-cations, misrepresentations and fraud, some of which were intended to mislead the public in general while others were aimed only at the Court and opposing counsel. One of the original representations to the Court and opposing counsel was that the Trust had been contemplated for years and that its confection on October 16, 1983 was simply coincidental. Though not actually a Cash Sale, the form of the sale was drafted and crafted to have the appearance of a Cash Sale so that it could be recorded without the signature of the vendee on Monday morning, October 17, 1983, before the TRO, prohibiting such transfer, could be granted by the Court. It was absolutely null and void because the recited purchase price had not been paid and the vendor had not delivered possession of the property. In his conversations with the Court, Gray did not disclose the existence of the Trust or the existence of the sale from CTR to the Trustee. Without the knowledge or permission of the Court, he recorded that conversation with the Court. Although he knew that the TRO had issued at 1:39 p.m. on Monday, and that Chambers was making a trip to Birmingham, Alabama to secure the Trustee's signature on an acceptance of the Trust and on the worthless $1.4 million dollar note, he made no effort to warn Chambers that these acts in completion of the sale had been restrained by the issuance of the TRO. The leaseback agreement executed some days later, in absolute contempt of the TRO and the injunction, sought to complete the sale by delivering constructive possession of the properties to the Trustee and to give the Trustee money to pay for the property which CTR itself had sold to the Trustee. All of the activities to be performed thereafter by conspirators and those who joined them later, namely, McCabe, Baker and Curry, in connection with the trial of this lawsuit were performed in connection with and in the furtherance of the conspiracy. Chambers continued his activities through August of 1986. In absolute violation of the injunction and of our Judgment of November 27, 1985, two of the officers of CTR filed oppositions to the joint applications for transfer which had been filed with the FCC by the

Order of this Court. Little over a month before the appellate court issued its decree in favor of NASCO and finding sanctions, Chambers hired McCabe who immediately rekindled the flames of harassment, delay and expense and McCabe, on behalf of Chambers, engineered the removal of equipment at the July 16, 1986 hearing and induced Chambers' wife, Rita Guillory Chambers, still President of CTR, another officer of CTR and CTR's CPA to perjure themselves as has previously been set forth. *See* Opinion dated August 7, 1986, Rec. 306.

Chambers has repeated ad nauseum that he knows nothing of courts or the law, that if he is guilty of any improper act, it is only because he has been led astray by the improper advice of his counsel. His own statement absolutely refutes that contention, Record Pleading 139. Mr. Chambers has been involved frequently in the preparation of defenses in many lawsuits, he testifies and often is the principal witness. He is completely at home in court. In fact, in January and the first part of February, 1985, alone he was involved in preparation of defenses and was scheduled to testify in the following cases:

1. *Powers Medical Systems, Inc. v. Intermedics, Inc.,* Civ. No. 82-623, U.S. District Court for the District of Oregon. Docketed for trial beginning on January 8, 1985. Mr. Chambers is a major witness.

2. *American Pacemaker Corporation v. Fairchild Camera and Instrument Corporation et al,* Civ. No. 448521, Superior Court of California, Santa Clara County; and *Fairchild Camera and Instrument Corporation v. American Pacemaker Corporation et al,* Civ. No. 526893, Superior Court of California, Santa Clara County. Trial in enforcement suit set to begin January 15, 1985. Mr. Chambers is a witness.

3. *Phillip R. Beutel v. Intermedics, Inc., et al,* Civ. No. 79C3022, 23rd Judicial District Court of Brazoria County, Texas. Trial scheduled to begin on January 28, 1985. Mr. Chambers is a principal witness.

4. *Intermedics, Inc. v. Cara E. Barer, Independent Executrix of the Estate of Albert P. Beutel, II,* Civ. No. 83-F-1153, 149th Judicial District Court of Brazoria County, Texas. Trial to begin before February 1985. Mr. Chambers is a witness.

5. *Charles Moore, M.D. v. Intermedics, Inc. and Intermedics Intraocular, Inc.,* Civ. No. 80-F-1320, 149th Judicial District Court in Brazoria County, Texas. Trial set to begin on February 18, 1985. Mr. Chambers is a principal witness.

He deliberately allowed his wife and three other employees to perjure themselves at the hearing of July 16, 1986. He has been very deeply involved in the defense of this case. He was the strategist. Gray was the tactician.

Gray was the second most important schemer and conspirator. As the conspiracy's tactician, he was perfectly willing to and did employ tactics involving abuse of the judicial machinery and process, fraud and untruths to the Court and unethical methods to achieve the purposes of the conspiracy as has been outlined above.

McCabe was the third schemer and conspirator. Although he had taken part earlier in the suit, his principal involvement occurred in July and August of 1986 at a time when the Court was using every means at its disposal to enforce its judgment of November 27, 1985 and complete the sale to NASCO. During his brief term as Chambers' attorney he displayed talents very similar to those of Gray. His unsavory actions, see paragraph f-i supra, convinced this Court that it could expect another prolonged campaign of harassment, delay and expense. Plaintiff and this Court can be very thankful that the Appellate Court's decree of August 6, 1985 had the effect of cutting the duration of his term of office to a period of little over a month.

Baker was certainly a conspirator. Although she did not have full knowledge of the conspiracy and did not independently and aggressively pursue the goals of the conspiracy, she was, as Trustee-Owner of the res involved in the initial fraud, indispensable to the success of the conspiracy

and the Public Records Doctrine defense in particular. She was the unfailing tool of her brother, the chief conspirator, and performed his every request without inquiry or question.

Curry also was a schemer and conspirator. Throughout this proceeding he has posed as the attorney for Baker, the individual, as if the limits of her overall knowledge and contact with the origin, purposes and progress of the conspiracy and litigation was in some manner reflected on him. Nothing can be further from the truth. Curry represented the Trust before he ever heard from Baker. He was contacted/hired directly by Gray to assist and defend the Public Records Doctrine defense contrived by Gray in which Chambers (settlor) established a Trust so that Chambers (sole stockholder and director of CTR) could authorize Chambers (CTR) to sell CTR's operating properties to Chambers (Trustee). Gray himself already represented all of the Chambers' identities except the Trust, but even with the separate representation of the Trust by Curry, it was painfully transparent that the sale and lease involving the Trust were a mere

sham. Curry knowingly and enthusiastically followed each tactic by Gray with a similar "me too" tactic on behalf of the Trust. His support was vital to the fraudulent Public Records Doctrine defense and valuable to the harassment tactics of Gray and Chambers, but he introduced no new or additional tactics to the defense. His role was one of passive but enthusiastic support.

The record is bare of one instance in which he truly advised his client. She knew no more about her responsibilities as trustee or about the details of this law suit on November 8, 1985 than she did at its inception. Curry's sole responsibility was to assure that she remained the unfailing tool of her brother. In this endeavor he was an admirable success.

29. As a direct result of the initial fraud upon the trial court, and the subsequent bad faith, dilatory defense tactics in the trial court, NASCO has incurred legal fees, costs, and expenses totalling $996,644.65:

Law Firm: Scofield, Bergstedt, Gerard, Mount & Veron

| | |
|---|---|
| Total Fees* | 486,901.25 |
| Total Expenses* | 52,508.55 |
| Minus Fees and Expenses Awarded as Contempt Damages | −4,454.00 |
| Minus Fees and Expenses Awarded as Appellate Sanctions | −48,633.57 |
| NET TOTAL | 486,322.23 |

* Includes fees and expenses of $18,703.43 for the instant proceeding.

Law Firm: Neal & Harwell

| | |
|---|---|
| Total Fees † | 424,795.00 |
| Total Expenses † | 55,262.57 |
| Minus Fees and Expenses Awarded as Contempt Damages | −300.00 |
| Minus Fees and Expenses Awarded as Appellate Sanctions | −17,589.45 |
| NET TOTAL | 462,168.12 |

† Includes fees and expenses of $34,756.25 for the instant proceeding.

Law Firm: Crowell & Moring

| | |
|---|---|
| Total Fees | 44,563.00 |
| Total Expenses | 3,591.30 |
| NET TOTAL | 48,154.30 |

TOTAL FEES AND EXPENSES 996,644.65

30. NASCO's evidentiary submissions show that the fees, expenses, and costs incurred in responding to the defendants' frivolous appeals total $66,223.02. Of that total, the sum of $63.63 is attributable to "costs," as that term is defined in Fed.R. App.P. 39 (specifically, $59.63 in printing costs for the appellee's brief, and $4.00 in costs paid to the Clerk of the Fifth Circuit). The remainder, $66,159.39, is attributable to attorney's fees and expenses.

| | |
|---|---|
| (1) Double costs | $ 127.26 |
| (2) Attorney's fees and expenses | $66,159.39 |
| TOTAL | $66,286.65 |

E. *Summary Comment:*

31.a. First Phase—This suit, as filed on October 17, 1983, was very simple and straightforward. NASCO alleged that Chambers and CTR had breached the Agreement by their failure to join with NASCO, on or before September 23, 1983, in an application to the FCC for the transfer of the KPLC–TV license as provided in the Agreement and demanded as follows:

A. Specific performance of the Purchase Agreement along with damages against defendants for their failure to perform the Agreement.

B. An expedited discovery schedule and expedited hearing.

C. Injunctive relief to preserve the *status quo* and NASCO's access to the records of CTR.

D. Alternatively, and should the Court find that specific performance was not an appropriate remedy, damages for defendants' refusal to perform.

Although many preliminary matters were presented and were considered, tried and decided by us (see Third Phase infra), the incredible fact is that *the First Phase, the merits of this suit, was never tried.*

b. Second Phase—After our conversation with Gray and the issuance of the TRO on October 17, 1983, the case still looked simple and we were prepared to expedite the trial of the case as requested as soon as defendants' answer was filed. We soon discovered, however, that we no longer had the simple suit which we expected.

NASCO's notice to attorney Golden on Friday, October 14, 1983 was transmitted to Chambers, CTR and Gray on Saturday, October 15, 1983, and provoked a meeting in Gray's office on the afternoon of Sunday, October 16, 1983 at which Chambers

and Gray, along with other members and employees of Gray's firm, conspired to give birth and did give birth to the despicable and unethical chain of events which we have identified as "The Initial Fraud". These acts, along with the lies and misrepresentations to the Court which accompanied them, made the suit more complicated and more difficult. By October 24, 1983, the date of the preliminary injunction conference, it was clear that NASCO had to make Baker a party defendant and it was most important to include her on an emergency basis in the injunction since the Trust was now the apparent record-owner of CTR's operating properties. Although NASCO's cause of action remained specific performance, that issue could not be addressed by us until we resolved the question of whether this Court has the power to restore the *status quo* existing at the time that NASCO delivered its notice to Golden, that is, the power to rescind the sale to the Trust so that title reverted to the defendant CTR. This Second Phase, whether the fraudulent sale from CTR to the trust had deprived this Court of jurisdiction, was the only issue before the court in the trial on the merits of April 17, 1985.

c. Third Phase—This phase is the informal and potentially effective defense of delay, harassment and the generation of mountainous expense so as to reduce the plaintiff to exhausted compliance. Chambers, Gray, Curry and McCabe initiated, provoked, pursued and tried any and every collateral side issue that human ingenuity could contrive. Although there was some legal basis for some of these defenses, when we view them in context with the entire record, it is quite obvious that defendants' true purpose was delay, harassment and killing expense. To borrow a phrase from the appellate court's unpublished opinion of August 27, 1986, "As judges, we cannot check our common sense in the robing room and allow disingenuous arguments to characterize as serious an appeal as manipulative as is this one before us."

Because of the admonition and warning which we voiced to Gray on October 24, 1983, and his apparent acceptance of that warning, we were confident that no additional untoward incidents would occur. We were confident that the expeditious resolution of this suit, as contemplated originally, could be accomplished.

We were dismayed and disappointed when NASCO on December 15, 1983 filed a Petition to Show Cause why defendants CTR and Chambers should not be held in contempt for their refusal to allow NASCO to examine certain records of CTR. This refusal was based on the advice of Gray on grounds that there was an ambiguity in Paragraph 19 of the Agreement and in the injunction and that the specific examination sought by NASCO was not authorized by the language of those instruments.[9] We ruled in favor of NASCO on the grounds that if there was an ambiguity it should be clarified by application to the Court and not by the unilateral action of defendants. The interlocutory appeal was denied by the Appellate Court on June 8, 1984.

Thereafter, Gray, on behalf of Chambers and CTR, and Curry, on behalf of the Trustee, filed a number of meritless and pointless motions, including a summary judgment motion filed by Gray on June 15, 1984, followed on July 6, 1984 by a similar motion by Curry demanding dismissal of the suit on grounds that the joinder of an alleged indispensable Louisiana defendant would destroy diversity. They filed baseless, affirmative defenses and counterclaims (later destroyed by their own stipulations), pointless new issues, irrelevant or unnecessary depositions, all as is described in more detail in paragraphs 23–27 supra. Untruths and misrepresentations were asserted mainly as affirmative defenses and counterclaims. At the time they were filed, the record was bare of any evidence that they were baseless. This was not known to the Court until the filing of stipulations immediately prior to trial. Not all of these demanded a great deal of court time but they were costly to NASCO in

---

**9.** This, incidentally, was the specific language incorporating Gray's comments and read verbatim to him and approved by him prior to our

signing the TRO on October 17, 1983. The same language appears in the injunction issued by us by consent of the parties on October 24, 1983.

terms of harassment, time, preparation and expense.

As related in paragraph 24 supra, on January 28, 1985, approximately one month prior to the then current trial date of February 27, 1985, Chambers and CTR filed a motion to disqualify the trial judge. Although the mover was well prepared, NASCO, because of the expedited procedure adopted by the Court to avoid delay, had to utilize extraordinary efforts by its attorneys to provide an opposition to the motion. The matter was heard and the motion denied for reasons recited in open court. A Writ of Mandamus to compel disqualification was filed with the U.S. Court of Appeals for the Fifth Circuit, supported by an Answer filed by Curry on behalf of the Trustee. Although writs were denied, the desired effect was attained. The trial was continued and did not begin until April 17, 1985.

All briefs and authorities had been submitted by the middle of June. Because of a personal difficulty we were absent from our office for a period of over three months and could not begin consideration of these authorities until the end of September when we were involved also in our trial calendar. Our Opinion issued November 8, 1985 and Judgment on the Merits was signed November 27, 1985. We retained jurisdiction and refused to stay proceedings so as to implement the completion of the sale at the earliest possible date. Petition for Writs of Mandamus or Prohibition were denied on appeal.

Throughout the period of trial we adhered and maintained our objective to try the specific performance case as expeditiously as possible. Suit was filed on October 17, 1983 and our final opinion on the merits was rendered November 8, 1985, a period of slightly over two years, including the period of the Court's absence in the summer of 1985. We hold that the extraordinary amount of costs and expenses expended in this proceeding were caused not by lack of diligence or any delays in the trial of this matter by NASCO, NASCO's counsel or the Court, but solely by the relentless, repeated fraudulent and brazen-

ly unethical efforts of Chambers, Gray and their co-conspirators acting with them, namely, McCabe, Baker and Curry, in their efforts, first, to deprive this Court of jurisdiction and, second, to devise a plan of obstruction, delay, harassment, and expense sufficient to reduce NASCO to a condition of exhausted compliance.

Although our Opinion of November 8, 1985 and our Judgment of November 27, 1985 should have terminated all further resistance to the specific performance of the Purchase Agreement (after all, the validity of the Agreement and its breach by Chambers (CTR) had been stipulated and the fraudulent Public Records defense had not deprived the Court of jurisdiction), this did not occur. Although Gray retired from his representation of Chambers (CTR) on April 2, 1986, Chambers continued with renewed vigor and vengeance his campaign of oppression, delay, harassment and massive expense. Without again discussing these incidents, they include: opposition by two CTR officers to the joint application of the transfer; renewal of discovery to determine NASCO's financial condition; the attempt, without informing the Court or opposing counsel, to substitute worn-out or obsolete equipment for the operating equipment in place on July 16, 1986; the perjured testimony in open court by Chambers' wife Rita Guillory Chambers, his long-time CTR officer-employee, and his employment of McCabe to rekindle and renew the campaign of harassment, oppression, delay and massive expense.

It would be impossible within the limits of this opinion to develop an accurate picture of this massive and absolutely unnecessary lawsuit forced on NASCO by Chambers' arbitrary and arrogant refusal to honor and perform this perfectly legal and enforceable contract. The record in this Court alone consists of 23 volumes of pleadings and 14 fully-packed expansion files of evidentiary material.

Even these voluminous records do not reflect a host of informal conferences on such subjects as requests for delays and extensions, the authority of Byrnes to sign the Purchase Agreement on behalf of NAS-

CO; the waiver of certain of plaintiff's initial demands; bifurcation; whether defendants were entitled to a jury trial; whether Tennessee law applied; defendants' allegation that this Court was invading the exclusive jurisdiction of the FCC; Chambers' application to the FCC to remove the broadcast towers to a site not covered by the Purchase Agreement; this Court's informal action to avoid contempt proceedings against two CTR officers who had filed with the FCC oppositions to the transfer of the KPLC–TV license to NASCO. These oppositions were filed in open defiance of the injunction affecting CTR and Chambers and the injunctive provisions of our judgment on the merits of November 27, 1985 in which this Court retained jurisdiction during the period of appeal for the purpose of implementing specific performance of the contract. These are instances of Chambers' continued opposition and continued refusal to comply with the Purchase Agreement even after he had been ordered to do so in our executory and unstayed judgment on the merits of November 27, 1985. Nor do they reflect the considerable and successful efforts of NASCO, Chambers and their attorneys to settle the amount of delay damages to which NASCO was entitled under the specific performance statutes of Louisiana. Or the records of the Appellate Court in the petitions for mandate and the several appeals filed by Gray and by Curry on behalf of Chambers (CTR). Or the records of the FCC in the several forays made into that agency. All this needless delay, harassment and expense; this despicable and unethical use and misuse of the judicial machinery and process was initiated by Chambers and Gray and was voluntarily and enthusiastically adopted by their co-conspirators, Curry and McCabe.

On August 6, 1986 the United States Court of Appeals for the Fifth Circuit affirmed the trial Court's judgment on the merits, found the appeal to be frivolous and assigned sanctions, and directed the trial court to determine whether sanctions for the proceedings held before it were appropriate. This decree of the Appellate Court halted effectively all further efforts of obstruction by defendants and their attorneys, and additional appeals then pending were withdrawn. The sale, under close Court supervision, was completed on August 27, 1986.

Even after the sale had been completed on August 27, 1986, two unresolved matters had to be concluded, namely, (a) the determination of the monetary amount of damages which had to be paid to NASCO under Louisiana law for Chambers' delay in performance of the contract and (b) sanctions—determination of the monetary amount of the sanctions decreed by the Appellate Court and a determination of whether sanctions were appropriate against defendants and their attorneys for the manner in which the defense was conducted in the trial court and the character and amount of such sanctions if they were held to be appropriate. As stated previously, item (a), delay damages under Louisiana law has been disposed of. We now address the sole remaining issue—sanctions.[10]

---

10. We were somewhat uncertain on the methodology to be utilized by us in determining the sanction issues as they related to proceedings before the district court. We were mindful that the responsibilities of the judge in a case of this kind are quite distinct and incompatible with those of an attorney-investigator in such case. Neither research nor our discussions with the Justice Department or the Administrative Office produced a solution. We also realized that an attorney would be the necessary and proper person to defend this court's judgment in case of appeal. The Third Circuit has recognized the problem in the context of Rule II appeals:

> Short of relying on or analogizing to contempt procedures and appointing counsel to defend the district court's ruling—a step we

have not taken—we are left in an uncomfortable position. We must play not only our accustomed and proper role of neutral adjudicator, but also (albeit temporarily) the role of adversary to the appellant in order to test the assertions made on appeal. Our role is further complicated by the institutional association we share with the appellant's "adversary" in fact: the district judge. We are surprised that this problem has attracted no attention. We offer no solutions to it, but simply note its existence.

*Snow Machines, Inc. v. Hedco, Inc.,* 838 F.2d 718, 726 (3d Cir.1988) (*see* footnotes 6 and 7, also at p. 726 but omitted in the above quote). We finally decided that NASCO's counsel would certainly make application for sanctions in the

## CONCLUSIONS OF LAW

32. There are three methods under which we may consider the issue of sanctions: Federal Rule of Civil Procedure II (Rule 11), 28 U.S.C. § 1927, and the inherent powers of the Court.

 33. *Rule II:* Rule 11, as amended in 1983, provides in pertinent part, as follows:

> Every pleading, motion, and other paper of a party represented by an attorney shall be signed by at least one attorney of record in the attorney's individual name.... The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.... If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction....

Fed.R.Civ.P. 11.

The rule became effective August 1, 1983 and this case was filed less than two and a half months later. It is well established that Rule 11 prior to its amendment in 1983 was rarely applied. The amendment was intended to reduce the reluctance of Courts to impose sanctions by emphasizing the responsibilities of attorneys and reenforcing those obligations through the imposition of sanctions, *Thomas v. Capital Sec. Services, Inc.*, 836 F.2d 866 (5th Cir.1988).

Although it broadened responsibilities, it did so in a narrow area. Rule 11 appears in Section III of the Federal Rules of Civil Procedure entitled "Pleadings and Motions." The topical title of Rule 11 itself is "Signing of Pleadings, Motions, and Other Papers; Santions." It is concerned only with the certification implied in the initial signing of a "pleading, motion, or other paper." It tests the attorney's conduct only at the time the paper is signed. As was noted by the Second Circuit:

> While the drafters of the rule could easily have further extended its application by referring to the entire conduct of the proceedings, they failed to do so and instead chose to expand only the categories of papers to which the rule applies.

*Oliveri v. Thompson*, 803 F.2d 1265, 1274 (2d Cir.1986). The problems of this case have little to do with the certification involved in the signing of a "pleading, motion, or other paper." On the contrary, NASCO has alleged that the defendants have: (1) attempted to deprive this Court of jurisdiction by acts of fraud, nearly all of which were performed outside the confines of this Court, (2) filed false and frivolous pleadings, and (3) attempted, by other tactics of delay, oppression, harassment and massive expense to reduce plaintiff to exhausted compliance. Clearly the acts alleged under "I" above do not involve certification and cannot be considered under Rule 11. The two most important instances of charge (2) are the absolutely false assertions knowingly and deliberately made by Chambers (CTR) and his attorneys in their answers and counterclaims and in their motion to disqualify. There was no evidence in the record establishing the falsity of these allegations until the beginning of the trial of the merits. Thus sanctions under Rule 11 at the time of filing of the answers and counterclaims in November

---

form of attorney's fees and expenses. The Court would rely on that application and the oppositions filed by defendants for investigation and the appropriateness of that kind of sanction. The Court would rely on its own research and any additional research that we might request of the parties regarding the imposition of other types of sanctions. On appeal, NASCO's

counsel is to defend the entire judgment of this Court, including sanctions other than attorney's fees and expenses. If sanctions are found and become final, they shall include the attorney's fees and expenses of NASCO's counsel in representing NASCO and the public in the sanction phase of this suit.

1983 and October 1984 were impossible. Certainly the Court could not have used Rule 11 to dispose of the motion to disqualify. Nor could the charges (3), such as the applications to the FCC to remove the communication towers to another site purchased by CTR, or any other acts referred to in (3) have been reached by Rule 11. We find and agree with the parties to this sanction proceeding that Fed.R.Civ.P. 11 does not furnish a basis for the consideration of the sanctionable acts alleged by NASCO. We find that Fed.R.Civ.P. 11 for the levying of sanctions at this time, at the time of the Appellate Court's decree on August 6, 1986, and at the time the acts themselves were committed, to be insufficient for our purposes here.

■ 34. *28 U.S.C. § 1927:* This statute provides in pertinent part:

> Any attorney ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorney's fees reasonably incurred because of such conduct.

28 U.S.C. § 1927.

The sanctionable acts alleged by NASCO are certainly outside the reach of this statute. First and most important, only sanctionable acts alleged against attorneys can be considered. Chambers, the principal conspirator, the driving force, and the only person whose interests were served by the conspiracy and the sanctionable acts alleged, is outside the scope of the statute. This alone is sufficient to reject the statute as a basis for our consideration of sanctions. In addition, the act is not broad enough to cover substantive acts against the Court: acts which degrade the judicial system; attempts to deprive the Court of jurisdiction, fraud, misleading and lying to the Court, and surreptitious taping of conversations with the Court. In addition, the only type of sanction provided is *excess* costs, expenses and attorney's fees. Sanctions other than expenses and attorney's fees may be more appropriate. We find 28 U.S.C. § 1927 insufficient as a basis for our consideration of the acts alleged in this proceeding to be sanctionable.

■ 35. Inherent Powers. It is well established that Courts possess the inherent power to levy sanctions in response to abusive litigation practices. *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980). *See Batson v. Neal Spelce Associates,* 805 F.2d 546, 550 (5th Cir.1986); *Huddleston v. Herman & MacLean,* 640 F.2d 534, 559–60 (5th Cir. 1981). *See also, Link v. Wabash Railroad Co.,* 370 U.S. 626, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962); *Miranda v. Southern Pacific Transportation Co.,* 710 F.2d 516 (9th Cir. 1983); *McCandless v. Great Atlantic and Pacific Tea Co., Inc.,* 697 F.2d 198 (7th Cir.1983).

The wielding of that inherent power is particularly appropriate when the offending parties have practiced a fraud upon the court.

> The inherent power of a federal court to investigate whether a judgment was obtained by fraud, is beyond question. *Hazel–Atlas Glass Co. v. Hartford–Empire Co.,* 322 U.S. 238, 88 L.Ed. 1250, 64 S.Ct. 997 [1944].... No doubt, if the court finds after a proper hearing that fraud has been practiced upon it, or that the very temple of justice has been defiled, the *entire cost* of the proceedings could justly be assessed against the guilty parties. Such is precisely a situation where "for dominating reasons of justice" a court may assess counsel fees as part of the taxable costs. *Sprague v. Ticonic Nat. Bank,* 307 U.S. 161, 167, 83 L.Ed. 1184, 1187, 59 S.Ct. 777 [780] [1939].

*Universal Oil Products Co. v. Root Ref'g Co.,* 328 U.S. 575, 580, 66 S.Ct. 1176, 1179, 90 L.Ed. 1447, 1452 (1946) (emphasis added). *See Hazel–Atlas Glass Co. v. Hartford–Empire Co.,* 322 U.S. 238, 245, 64 S.Ct. 997, 1001, 88 L.Ed. 1250, 1255 (1944); *Kupferman v. Consolidated Research & Mfg. Corp.,* 459 F.2d 1072, 1078 (2d Cir. 1972); *United Bus. Communications v. Racal–Milgo, Inc.,* 591 F.Supp. 1172, 1187 (D.Kan.1984); *Eppes v. Snowden,* 656 F.Supp. 1267, 1277–79, 1281–82 (E.D.Ky. 1986).

■ Such power is incident to the court's "duty to protect the integrity of the judicial process." *Dolphin Plumbing Co. v. Financial Corp. of North America,* 508 F.2d 1326, 1327 (5th Cir.1975). *See Eash v. Riggins Trucking, Inc.,* 757 F.2d 557, 562–63 (3d Cir.1985) (inherent power derives from "judicial powers pursuant to Article III," from "the nature of the court," and from "necessity" or practicality). Accordingly, the inherent power of a court "over members of its bar is at least as great as its authority over litigants." *Roadway Express,* 447 U.S. at 766, 100 S.Ct. at 2464, 65 L.Ed.2d at 501. The Fifth Circuit has held:

> The inherent power of a court to manage its affairs necessarily includes the authority to impose reasonable and appropriate sanctions upon errant lawyers practicing before it. The *Woodham* case [*Woodham v. American Cystoscope Co.,* 335 F.2d 551 (5th Cir.1964)] at p. 557, says that "courts may resort to disciplinary action against the erring attorney," and quotes with approval the following from Sanctions at Pre–Trial Stages, 72 Yale L. Jour. 819, 830:
>
> > " * * * In addition, alternative modes of discipline against the attorney might include: (1) a reprimand by the court, (2) a finding of contempt, or (3) a prohibition against practicing for a limited time before the court whose order was neglected or disregarded. It seems fairly clear that the judicious use of such measures would tend to promote attorney compliance in the first instance."

*Flaksa v. Little River Marine Construction Co.,* 389 F.2d 885, 888–889 (5th Cir. 1968), *cert. denied,* 392 U.S. 928, 88 S.Ct. 2287, 20 L.Ed.2d 1387 (1968) (footnote omitted).

The *Flaksa* court quoted with approval the dissent of Chief Judge Biggs in *Gamble v. Pope & Talbot,* 307 F.2d 729, 735 (3d Cir.1962) (en banc):

> "The power of a court to discipline members of its own bar can scarcely be doubted seriously. An attorney is under no obligation to seek admission to the bar of a United States district court. He is at liberty to abstain from membership in that or any other bar. But when he does apply and is admitted he secures certain privileges and also assumes definite obligations.
>
> "The power of a court to impose appropriate and reasonable sanctions upon those admitted to its bar is a familiar phenomenon and lies within the inherent power of any court of record. * * *"

*Flaksa,* 389 F.2d at 888 n. 10. *See also, Roadway Express,* 447 U.S. at 766 n. 12, 100 S.Ct. at 2464 n. 12, 65 L.Ed.2d at 501 n. 12 (citing Chief Judge Biggs' dissent in *Gamble* with approval). In *Gamble,* the Third Circuit held that, absent formal contempt proceedings, a district court lacked inherent power to sanction an attorney for violating a court rule. Recently, the Third Circuit noted that *Gamble* had been roundly criticized and rejected and so, over-ruled *Gamble:* "the importance and necessity of some kind of sanction as one of the reasonable and flexible instruments for curbing abuse of the judicial process suggests that *Gamble* should no longer control...." *Eash v. Riggins Trucking, Inc.,* 757 F.2d 557, 568 (3d Cir.1985) (en banc). In short, our inherent authority to discipline attorneys in response to abusive litigation practices cannot, at this late date, be questioned. *See, Ex Parte Burr,* 22 U.S. (9 Wheat.) 529, 6 L.Ed. 152 (1824); *Ex Parte Secombe,* 60 U.S. (19 How.) 9, 15 L.Ed. 565 (1856).

"We do not doubt the power of the court to punish attorneys as officers of the same, for misbehavior in the practice of the profession. This power has been recognized and enforced ever since the organization of courts, and the admission of attorneys to practice therein." *Ex Parte Bradley,* 74 U.S. (7 Wall.) 364, 19 L.Ed. 214 (1869). *See State v. Cannon,* 206 Wis. 374, 240 N.W. 441 (1932) (reviewing cases from the Middle Ages to the nineteenth century on inherent power of courts to disbar attorneys). "The court's control over a lawyer's professional life derives from his relation to the responsibilities of a court." *Theard v. U.S.,* 354 U.S. 278, 281, 77 S.Ct. 1274, 1276, 1 L.Ed.2d 1342, 1344 (1957).

The authority of the court over its attorneys and counselors is of the highest importance. They constitute a profession essential to society. Their aid is required, not merely to represent suitors before the courts, but in the more difficult transactions of private life. The highest interests are placed in their hands and confided to their management. The confidence which they receive and the responsibilities which they are obliged to assume, demand not only ability of a higher order, but the strictest integrity. The authority which the courts hold over them, and the qualifications required for their admission, are intended to secure those qualities. *Randall v. Brigham*, 74 U.S. (7 Wall.) 528, 540, 19 L.Ed. 285, 293 (1869). Finally, as noted by the Supreme Court, "[c]ourts have long recognized an inherent authority to suspend or disbar lawyers." *In re Snyder*, 472 U.S. 634, 643, 105 S.Ct. 2874, 2880, 86 L.Ed.2d 504, 512 (1985) (citing *Ex Parte Garland*, 71 U.S. (4 Wall.) 333, 378–79, 18 L.Ed. 366 (1867) and *Ex Parte Burr*, 22 U.S. (9 Wheat.) 529, 531, 6 L.Ed. 152 (1824)). *See also*, Local Rule 3, Disbarment; *U.S. v. Klubock*, 832 F.2d 649, 652 (1st Cir.1987).[11]

**11.** Where, as here, the allegedly sanctionable acts were committed in the conduct and trial of the very proceeding in which sanctions are sought, no prior notice to the defendants is required. This is the customary procedure and the very procedure followed by the appellate court when, on August 6, 1986, it found the appeal in this case to be sanctionable. The court has the power, without prior notice, to assess sanctions in order to regulate and protect its jurisdiction and the orderly and judicious conduct of proceedings before it.

This sanction proceeding is based upon an existing, or pre-existing, record. The defendants have full knowledge of that record. No prior notice of that record of potentially sanctionable conduct is herein required. Our "power to disbar an attorney proceeds upon very different grounds 'from those which support a court's power to punish for contempt.'" *Cammer v. U.S.*, 350 U.S. 399, 408 n. 7, 76 S.Ct. 456, 460 n. 7, 100 L.Ed. 474, 480 n. 7 (1956) (quoting *Ex Parte Robinson*, 86 U.S. (19 Wall.) 505, 512, 22 L.Ed. 205 (1873)). Therefore, we hold that criminal contempt procedures are not here required. *See Donaldson v. Clark*, 819 F.2d 1551 (11th Cir.1987). *Cf. Ex Parte Wall*, 107 U.S. 265, 288, 2 S.Ct. 569, 589, 27 L.Ed. 552, 561 (1883) ("The proceeding is not for the purpose of punishment, but for the purpose of preserving the courts of justice from the official ministration of persons unfit to practice in them.").

Nonetheless, we set a hearing for April 11, 1988 to (1) determine the monetary total of double costs and attorney's fees assessed as sanctions by the appellate court and to (2) determine whether sanctions were appropriate and justified by the conduct of defendants in our Court. All parties were aware that the matter would be tried by this Court on the record and the proceedings in this case, including NASCO's memorandum of fees and expenses, which the Court ordered to be filed on or before March 8, 1988. Also on order of the Court, NASCO and the sanctioned defendants filed suggested findings of fact and conclusions of law. Not one of these defendants presented a defense based on lack of due process or lack of notice of the specific charges. In fact, due process has never been an issue in this matter. However, in our consideration of whether sanctions were appropriate, we determined that the conduct of certain of these defendants and their abuse and misuse of judicial machinery and procedures might require disbarment or suspension from appearance in this Court. Such a sanction obviously would involve governmental deprivation of a liberty or property interest. With this in mind, on December 12, 1988 we notified the parties of the legal basis for sanctions and of the range of sanctions, including disbarment, which we were considering. We invited the parties to submit memoranda of authority on or before December 22, 1988 and such memoranda were duly received from NASCO and from the defendant attorneys.

We have so acted because procedural due process requires notice and an opportunity to be heard before any governmental deprivation of a liberty or property interest. *Boddie v. Connecticut*, 401 U.S. 371, 379, 91 S.Ct. 780, 787, 28 L.Ed.2d 113, 119 (1971). *Ex Parte Bradley*, 74 U.S. (7 Wall.) 364, 372–74, 19 L.Ed. 214 (1869). But the "very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Cafeteria & Restaurant Workers Union v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230, 1236 (1961). *See also, Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972); *Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Instead, the "adequacy of notice and hearing respecting proceedings that may affect a party's rights turns, to a considerable extent, on the knowledge which the circumstances show such party may be taken to have of the consequences of his own conduct." *Link v. Wabash Railroad Co.*, 370 U.S. 626, 632, 82 S.Ct. 1386, 1390, 8 L.Ed.2d 734, 739 (1962).

Given the full knowledge of the record possessed by all defendants, given the hearing held on April 11, 1988, and given the opportunity afforded defendants to file further memoranda on or before December 22, 1988, we hold that

36. On our own initiative and utilizing the inherent powers of this Court, we have found sanctions, as well as the type and amount of sanctions, and in doing so have followed the following criteria:

a. When we have used the word "delay" in our discussions above, we refer to that period ending on the date on which the Act of Sale was finally executed, namely, August 27, 1986. That is the day on which the sale originally envisioned in the Purchase Agreement was finally completed. Although the suit continued thereafter, this continuation was necessary only for the purpose of determining delay damages due NASCO under the laws of the State of Louisiana for CTR's failure to complete the sale until August 27, 1986, and secondly, for the determination of sanctions which is still in progress. The attorney's fees and expenses charged to NASCO by its attorneys for both of these procedures flowed from and were a direct result of this suit. We shall include them in the attorney's fees sanctions. *See* note 11 supra.

b. We have limited sanctions against attorneys to those attorneys who were designated or acted as the trial attorneys in this matter. Numerous other attorneys in the firms of these trial attorneys have filed and/or signed pleadings and other papers which appear of record. They may be guilty of sanctionable acts but the record does not disclose the character or the extent of participation by these attorneys. It is certain that many of them signed and/or filed pleadings and papers as a matter of convenience or by the direction of the trial attorney. We consider sanctions in this suit to be a very heavy penalty which should be imposed only after serious consideration based on unimpeachable and weighty evidence and a definite conviction that they are necessary and appropriate under the circumstances in which the sanctioned acts were performed.

c. Certain attorneys may have been charged or mentioned in the sanction proceedings. Considering the fact that these are not criminal proceedings, that this Court is considering very heavy sanctions, the requirements of due process have been amply met in this matter.

that the very fact that the attorney was charged could bring upon him the sting of disrepute, we have determined to make no mention of charges or the names of such attorneys against whom no sanctions are imposed.

d. All attorneys who have been admitted to the bar of the United States District Court for the Western District of Louisiana and who, therefore, appear on the list of attorneys who have been accepted for practice before this Court take either an affirmation or oath of the following tenor: "I do solemnly swear (or affirm) that I will demean myself as an attorney and counsel of this Court, uprightly and according to law, and that I will support the Constitution of the United States. So Help Me God." One attorney, McCabe, is a resident of and a member of the bar of the State of Massachusetts; was by special order of this Court allowed to represent CTR and Chambers in this proceeding; did not take the oath above but did, we are sure, take a similar oath when he was formally qualified to practice. He, like the other attorneys, is considered an officer of the Court and expected by the Court to conduct himself as such.

e. We have stated above that Fed.R. Civ.P. 11 was amended in 1983 to reduce the reluctance of courts to impose sanctions by emphasizing the responsibilities of attorneys and reenforcing those obligations through the imposition of sanctions. *Thomas v. Sec. Services, Inc., supra.* The spirit which induced the amendment of Rule 11 in 1983 should not be limited to that Rule. The Courts should not hesitate to address and sanction similar transgressions in whatever the judicial theater they may occur. This case is as classic an example of vicious, deliberate, deceitful, fraudulent and sanctionable conduct as the Courts can produce.

37. Trial by ordeal, that most ancient, most archaic and barbaric practice, has been for centuries in disrepute. We have before us its modern counterpart. Although NASCO did not have to survive the

ordeal of boiling water or searing flame without visible harm, it has suffered its modern counterpart. NASCO possessed an admittedly legal and valid contract. Chambers arbitrarily and without legal cause refused to perform, forcing NASCO to bring its suit for specific performance. Chambers, through his attorneys, filed answers and counterclaims alleging defaults by NASCO which both Chambers and his attorneys knew were false at the time they were filed. We have referred previously to the immense volume of pleadings and evidentiary material in this and other Courts. NASCO suffered delay damages which by agreement of the parties amounted to $850,000.00. NASCO has been forced to spend approximately a million dollars in attorney's fees and expenses in this Court alone to win a suit in which defendants did not introduce one item of evidence to dispute its right to specific performance. This is a trial by ordeal. How many plaintiffs could suffer the oppression and harassment required to fight this case to a finish? The attorneys who engineered this mockery are a disgrace to the profession. This is not rhetoric. This is fact. This is tragedy. Sanctions should be sufficiently severe to convince others that such tactics shall not be tolerated in the Courts of these United States. The sanctions assigned and established in this paragraph apply only to sanctionable acts which occurred in connection with the proceedings in the trial Court.

■ a. G. Russell Chambers—We need not review the conduct of Chambers. Although this entire opinion is a chronical of his sanctionable acts, these acts, as well as those of the other sanctioned defendants, are recapitulated in brief form in paragraphs 26–28 supra. Chambers, knowing that NASCO had a good and valid contract, hired Gray to find a defense and arbitrarily refused to perform, thereby forcing NASCO to bring its suit for specific perform-

ance and injunctive relief. Chambers and Gray misused the notice by NASCO of its application for injunctive relief to set up the fraudulent public records defense. This was the first battle in their long and arduous campaign of fraud, deceit, delay, harassment, oppression and expense, culminating finally on August 27, 1986 when the sale to NASCO finally was completed. We assess as sanctions for Chambers' unlawful conduct attorney's fees and expenses of $996,644.65. This sum is exclusive and does not include fees and expenses previously awarded by this Court in the contempt proceedings in the amount of $4,754.00, or the attorney's fees and expenses awarded as sanctions by the Court of Appeals which we have determined to be $66,223.02. The figure does include, however, $53,459.68 in attorney's fees and expenses paid by NASCO for services rendered in connection with the sanctions portion of this suit. This latter portion of the fees and expenses, like the balance of such fees and expenses included in the sanctions, would not have been incurred by NASCO if Chambers had not defaulted and forced NASCO to bring this suit. There is absolutely no reason why Chambers should not reimburse in full all attorney's fees and expenses that NASCO, by Chambers' action, was forced to pay.[12]

These fees and expenses were paid by NASCO to its attorneys. They were assembled, documented and sent to each of the defendants by order of the court on March 8, 1988 and prior to the hearing of April 11, 1988. NASCO paid them without protest and Chambers has not challenged the amount. Nor is it required that the attorney's fees meet the standard set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974). *Davis v. Veslan Enterprises*, 765 F.2d 494 (5th Cir. 1985), and *Hornbuckle v. Arco Oil & Gas Co.*, 732 F.2d 1233 (5th Cir.1984).

12. We have also considered monetary sanctions to compensate the United States for waste of judicial resources caused by this suit. Such sanctions are not without precedent, at least under Rule 11. *See Robinson v. Moses,* 644 F.Supp. 975, 982 (N.D.Ind.1986); *Dominguez v. Figel,* 626 F.Supp. 368, 374 (N.D.Ind.1986); *Thiel*

*v. First Federal Savings & Loan Assoc. of Marion,* 646 F.Supp. 592, 598 (N.D.Ind.1986). In fact, Courts have routinely ordered an award of a part of such costs when settlements are reached on the first day of trial and jury costs are awarded.

The amount of the sanction is substantial but it is no more substantial than were the bills when NASCO was obliged to pay them. We agree with the statement of Judge Goldberg in *Schwarz v. Folloder,* 767 F.2d 125, 133–134 (5th Cir.1985), as follows:

> After Alexander Grant's attorney requested attorney's fees, the court sarcastically commented, "You mean to say your client has spent four hundred thousand dollars defending a lawsuit that it determined a long time ago was frivolous?" 13 Rec. at 4. Given this statement, it is possible that the court denied attorney's fees on the ground that Grant was wrong to spend so much money in defending a suit that had been frivolously filed. If so, the district court was in error. We agree with the sentiments expressed in *Dayan v. McDonald's Corp.,* No. 70CH 2258 (Ill.Cir.Ct. March 1, 1983):
>
>> It is unbecoming for the plaintiffs to hail the defendant into court by means of false allegations and then to complain when the defendant hires skillful, experienced and expensive advocates to defend against those allegations. Having wrongfully kicked the snow loose at the top, [the plaintiff] must bear the consequences of the avalanche at the bottom.

The shoe fits a frivolous defense as well as it does a frivolous cause of action.

■ b. Mable Christine Baker—Baker was an indispensable and willing party to the scheme and conspiracy, although she knew none or little of the significance of her participation. Her sanction is our reprimand.

■ c. A.J. Gray, III—The defendants in this case who are attorneys are distinctly different from the other defendants under consideration. An attorney is schooled in the law. Because of his unique relationship with his clients and with the public, he is taught ethics and governed by rules of professional ethics. The Court has a right to expect him, as an officer of the Court, to lend his assistance in preserving order and decorum in the Court; to be truthful and forthright with the Court and other counsel; to be truthful and not mislead the court or other counsel. His signature certifies that pleadings and other documents filed by him are "to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation." Rule II. He is bound to preserve the integrity of the law and the Constitution of the United States and the several states and to seek justice in his representation of clients before the Court. In his conduct in this case, Gray has actively violated almost every one of these ethical and professional responsibilities. He accepted and tried a case for the explicit purpose of doing injustice, i.e., he used every means at his disposal to defeat a perfectly legal and enforceable purchase contract against which he well knew his client had no defenses. He misused the injunction notice given by NASCO. He devised a fraudulent and illegal scheme to deprive this Court of the jurisdiction which it had at the time NASCO's notice was delivered on Friday, October 14, 1983. The sale to the Trust as attempted was an absolute simulation and totally void and incomplete at the time it was recorded. It was recorded in haste for the purpose of rendering the impending injunction ineffective. He not only failed to disclose essential and pertinent facts, he actively misled the Court and recorded his conversation with the Court without disclosing to the Court his intent to do so. By these actions the Court was forced to delay action on the merits until it was determined by trial that the Court again had jurisdiction. During this delay Gray utilized his legal skills and experience to lead, on behalf of Chambers, a campaign of harassment, oppression and delay sufficient to force NASCO to spend over a million dollars in attorney's fees and expenses to defend its rights to the performance of a perfectly legal and enforceable contract. More amazing, this was ac-

complished without the introduction by defendants of one single item of evidence against the validity of the Purchase Agreement. This case is unique. The manner in which it was conducted by Gray is a disgrace to the legal profession. It is our reluctant duty as a sanction to disbar Gray from practice as an attorney in the Western District of Louisiana; to order that his name be stricken from the roll of the attorneys authorized to practice before this Court, and that he be prohibited, for a period of three years from the date upon which this case becomes final, from making application for readmission to the rolls of the this Court.

■ d. Richard A. Curry—Curry knew all the details of the public records defense and participated in the campaign of harassment and oppression. But, he initiated nothing on behalf of Chambers. Customarily he filed his pleadings merely in support of pleadings previously filed by Gray.

Under his representation the Trustee, Baker, remained the willing tool of Chambers through the duration of the litigation and knew no more about her responsibilities as Trustee at the end of the litigation than she did the first day that Curry was hired. We assign as a sanction that Curry be suspended from practice as an attorney in the Western District of Louisiana for a period of six (6) months but that his name remain on the rolls of the attorneys qualified and admitted to the practice before this Court so there will be no need for an application for readmittance.

■ e. Edwin A. McCabe—McCabe is a resident of and practices law in Boston, Massachusetts. He does not appear on the rolls of the attorneys authorized to practice before this Court but by the order of this Court on July 16, 1986 he was admitted for the purpose of representing Chambers in this specific suit. On this date, some eight months after the issuance of our Judgment on the Merits of November 27, 1985, Chambers was still resisting performance of the purchase contract. We, on motion of NASCO, were lending our assistance to promote that performance. The sole issue to be tried at the July 16, 1986 hearing was whether operating equipment which had replaced worn or outdated equipment described in the 1983 Purchase Agreement was to be included in the sale to NASCO. The Court had overruled several pretrial motions filed by McCabe and, before commencing the actual hearing, warned McCabe that we had experienced a great deal of unethical conduct throughout the trial of this case and would tolerate no further acts of that nature. Despite these warnings, two highly unethical acts occurred during the hearing. During a three day recess after the 16th, all of the equipment at issue in the hearing was removed and taken off line and the worn-out or outmoded equipment described in the 1983 Purchase Agreement was placed in operation. This was done on the admitted advice of McCabe without the consent of the Court or opposing counsel and, indeed without informing either of them. We deemed this to be an act of arrogance, in direct violation of the warning by the Court, and we ordered the immediate reinstallation of the equipment which had been removed.

Thereafter, an attempt was made to prove that the equipment in question was not owned by CTR but was owned by another corporation wholly owned by Chambers and leased at various times since August 1983 by that corporation to CTR. Three witnesses, Mrs. Chambers, CTR's independent CPA and a long-time employee of CTR, testified in support of this contention. It was proved beyond doubt that all of this testimony was perjury, that all of the leases were fraudulent. None of the leases had been drafted or executed prior to 1986, a date which, incidentally, followed our final judgment on the merits.

Thereafter McCabe filed other baseless pleadings and appealed our decision on the July 16 hearing, all as is described in more detail in paragraphs 26, 27 and 28 supra. McCabe terminated his representation when the Appellate Court issued its decree of August 6, 1986. His appeal and all of his pleadings were immediately recalled by him. Nevertheless, his transgressions were serious and we assign as a sanction our severest reprimand against him for his

actions, and declare him ineligible to practice in the Western District of Louisiana for a period of five (5) years.

38. We determine the amount of attorney's fees and double costs assessed as sanctions by the United States Court of Appeals for the Fifth Circuit against appellant G. Russell Chambers to be attorney's fees in the amount of $66,159.39, and double costs in the amount of $127.26, accruing in sum to $66,286.65.

39. A certified copy of this Opinion and the Judgment to follow shall be sent by the Clerk of Court to: (1) the Office of Bar Counsel, Daniel Klubach, Board of Bar Overseers of the Supreme Judicial Court, 11 Beacon Street, Boston, Massachusetts 02108, and (2) the Supreme Court of Louisiana, 109 Supreme Court Building, 301 Loyola Avenue, New Orleans, Louisiana 70112–1887.

DONE AND SIGNED.

## JUDGMENT

For the reasons set forth in our Opinion this date:

IT IS ORDERED, ADJUDGED AND DECREED that judgment be rendered herein in favor of the movant, NASCO, Inc., and against respondent, G. Russell Chambers, in the full sum of $66,286.65, representing the amount of the sanctions imposed by order of the United States Court of Appeals for the Fifth Circuit, with interest payable in accord with 28 U.S.C. § 1961.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that judgment be rendered herein in favor of the movant, NASCO, Inc., and against respondent, G. Russell Chambers, in the full sum of $996,644.65 as sanctions, representing the total attorney's fees and expenses incurred and paid by NASCO, Inc. in this matter, with interest payable in accord with 28 U.S.C. § 1961.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Mable Christine Baker is reprimanded.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that A.J. Gray, III be stricken from the roll of attorneys authorized to practice in the Western District of Louisiana and that he be prohibited for a period of three (3) years from making application for readmission.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Richard A. Curry be suspended from practice in the Western District of Louisiana for a period of six (6) months.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Edwin A. McCabe of the Massachusetts Bar is severely reprimanded and declared ineligible to practice in the Western District of Louisiana for a period of five (5) years.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the Clerk of Court shall send a certified copy of this Opinion and Judgment to (1) the Office of Bar Counsel, Daniel Klubach, Board of Bar Overseers of the Supreme Judicial Court, 11 Beacon Street, Boston Massachusetts 02108, and (2) the Supreme Court of Louisiana, 109 Supreme Court Building, 301 Loyola Avenue, New Orleans, Louisiana 70112–1887.